JEAN BOISE CARGILL *vs.* HARVARD UNIVERSITY.

No. 01-P-917.

*Middlesex.* April 7, 2003. - March 8, 2004.

Present: RAPOZA, COWIN, & BERRY, JJ.

*Anti-Discrimination Law,* Employee, Handicap. *Employment,* Discrimination. *Handicapped Persons. Practice, Civil,* Summary judgment. *Words,* "Essential functions."

Discussion of the analytic framework used to determine the "essential functions" of a job, as that term is used in G. L. c. 151B, § 4(16), which prohibits discrimination against handicapped persons in the workplace. [594-597]

In an action alleging employment discrimination on the basis of handicap, a Superior Court judge erred in granting summary judgment in favor of the defendant employer, where the record revealed sharply conflicting evidence whether certain duties were "essential functions" of the plaintiff's job, thereby presenting genuine issues of material fact for trial [597-603], and where the defendant employer failed to establish that the accommodation proposed by the plaintiff would cause undue hardship or be otherwise unreasonable [603-604].

This court concluded that a plaintiff alleging employment discrimination on the basis of handicap in violation of G. L. c. 151B, § 4(16), could not, so long as her c. 151B claim remained viable, pursue a remedy under G. L. c. 93, § 103, the Massachusetts Equal Rights Act. [604]

CIVIL ACTION commenced in the Superior Court Department on June 27, 1997.

The case was heard by *Herman J. Smith, Jr.,* J., on a motion for summary judgment, and motions for reconsideration were heard by him.

*Betsy L. Ehrenberg* for the plaintiff.

*David C. Casey* (*James M. Hankins* with him) for the defendant.

BERRY, J. The central contested question in this appeal requires consideration of the legal standards and evidentiary criteria for determining the "essential functions" of a job as that term is

used in G. L. c. 151B, § 4(16), which prohibits discrimination against qualified handicapped persons.[1] To establish a violation of G. L. c. 151B, § 4(16), proof is required that (1) the plaintiff is handicapped within the meaning of the statute; (2) the plaintiff is a "qualified handicapped person" (meaning that, notwithstanding the handicap, the plaintiff can perform the essential functions of the job, either [a] without accommodation, or [b] with a reasonable accommodation provided by the employer, subject to the statutory qualification that the accommodation not pose an undue hardship upon the employer); and (3) the handicap was the cause of the allegedly unlawful discriminatory action. See *New Bedford* v. *Massachusetts Commn. Against Discrimination*, 440 Mass. 450, 461-462 (2003), quoting from G. L. c. 151B, § 4(16). See also *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 821 (1997); *Dahill* v. *Police Dept. of Boston*, 434 Mass. 233, 243 (2001). As G. L. c. 151B, § 4(16), and the applicable case law make clear, a significant question may involve the determination of precisely what the essential functions of the subject job are — that is, what skills must be possessed by, and what work activities necessarily must be performed by, an employee in order to accomplish the principal objectives of the job. See *Cox* v. *New England Tel. & Tel. Co.*, 414 Mass. 375, 383-384 (1993).

This case involves the dismissal of the plaintiff, Jean Boise Cargill, from her employment as the lead reference librarian for the five clustered botany libraries that comprise the Herbaria collection at Harvard University (Harvard).[2] There is no dispute in this case (as Harvard acknowledges) that Cargill, who suffers

---

[1] General Laws c. 151B, § 4(16), as inserted by St. 1983, c. 533, § 6, states that it is unlawful for any employer "to dismiss from employment . . . or . . . discriminate against, because of [her] handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business."

[2] Cargill's complaint challenging her dismissal was pleaded in two counts alleging violations of G. L. c. 151B, § 4(16), by Harvard's (1) failure to provide a reasonable accommodation, and (2) discriminatory termination of her employment; in a third count, Cargill pleaded a violation of the Massachusetts Equal Rights Act (MERA), G. L. c. 93, § 103.

from rheumatoid arthritis,[3] is handicapped within the meaning of G. L. c. 151B, § 4(16). Nor is there any dispute that Cargill — who holds a doctorate in botany and a master's degree in library science and worked for eleven years in the Herbaria library system, culminating in her promotion to lead reference librarian[4] — possesses the requisite academic and professional qualifications for the position. Rather, the crux of the dispute revolves around issues of material fact concerning whether, among the multiplex activities performed by the lead reference librarian, it was essential that Cargill perform two particular tasks in order to accomplish the fundamental and principal objectives of the position, and whether, and the degree to which, Harvard had any obligation to make an accommodation for Cargill's handicap.

Specifically, the conflicting summary judgment materials concern (1) whether, in addition to the relatively cerebral and academic research and reference functions of the reference librarian position, two more physically oriented tasks — referred to as paging/retrieval and shelving, both of which entailed the manual labor of carrying books and materials (sometimes quite heavy) in and about the archival collections and lifting and shelving them to the respective collection stacks — were also essential functions; and (2) whether, if such paging/retrieval and shelving of books were deemed to be essential functions, Cargill could have performed these functions with a reasonable accommodation — an aspect of the matter that Cargill contends Harvard failed to consider.

The question of essential function is intensely fact-based and requires "individualized inquiry and . . . appropriate findings of fact." *Cox* v. *New England Tel. & Tel. Co.*, 414 Mass. at 383, quoting from *School Board of Nassau County* v. *Arline*, 480 U.S. 273, 287 (1987). The fact finder must analyze the question

---

[3]Rheumatoid arthritis causes intermittent periods of painful joint inflammation, which limit free physical movement. The condition is progressive and irreversible, although there may be periods of remission or stabilization. Cargill was first diagnosed with the disease in 1969.

[4]In June, 1985, Cargill began working for the Herbaria as a research bibliographer. In 1987, she advanced to the position of library assistant. In early 1990, she was promoted to "library assistant, reference/archives," and in September, 1991, she was appointed to the position of lead reference librarian.

in accord with the legal standards and evidentiary criteria set forth in the case law and regulations addressed herein. Following our independent review, we determine that the grant of summary judgment, issued in a third decision of the Superior Court,[5] was in error. We are of the opinion that the record presents significant and genuine issues of disputed material fact, both as to whether paging/retrieval and shelving constitute essential functions of the reference librarian job and, if so, whether a reasonable accommodation could have been tailored without undue hardship to Harvard. Moreover, there was error of law in the lower court's failure to apply the appropriate legal standards and evidentiary criteria that govern these determinations.

1. *Factual background.* Because of the factual nature of the required inquiry into essential function, we set forth the record background in some detail in order to describe the main work activities of the reference librarian; what paging/retrieval and shelving entail; and the interactions between Cargill and Harvard concerning her handicap in connection with the tasks of paging/retrieval and shelving. As required when reviewing a grant of summary judgment, we "view[] the evidence in the light most favorable to the nonmoving party." *Augat, Inc.* v. *Liberty Mut. Ins. Co.,* 410 Mass. 117, 120 (1991).

A. *The reference librarian position.* At the executive level of the Herbaria library staff are the head librarian and the lead reference librarian, the latter position being the one Cargill held. There are four additional full-time employees: three library assistants and a cataloger. This full-time staff of six is supplemented by part-time employees, including Harvard students,

---

[5]The Superior Court judge issued three different decisions on Harvard's summary judgment motion, with three different outcomes. In the first decision, Harvard was granted summary judgment on the two G. L. c. 151B handicap discrimination claims, with the judge determining that Cargill "failed to raise a genuine issue." However, in that first decision, summary judgment was denied on the MERA claim. In a second decision entered on cross motions for reconsideration, the judge reversed the prior judgment on the c. 151B claims, left standing the denial of judgment on the MERA claim, and ordered a trial on all three counts of the complaint. In a third decision, the judge changed course again, vacating all prior rulings and granting Harvard summary judgment on all counts of the complaint. The judge explained the last action on the basis that he had not received Harvard's opposition to Cargill's motion for reconsideration prior to the second decision.

some of whom are work-study students and other part-time workers. (Both the full-time library staff and these part-time employees have access to the collection stacks and perform the tasks of paging/retrieval and shelving, which are further described below.)

The record submissions emphasize the reference librarian's duties to provide academic-based research and reference assistance to scholars seeking sources within the vast array of Herbaria materials — principally patrons who visit the library, but also nonresident scholars who submit written inquiries to the reference librarian. See note 12 and part 4, *infra*. The job description does not include paging/retrieval and shelving. See note 12, *infra*.

B. *Paging/retrieval and shelving within the library structure.* Because of the balkanized layout of the Herbaria library collections, which are housed in five libraries in three different locations,[6] the paging/retrieval and shelving of books and materials require movement among several buildings and within the nooks and crannies of the various collection stacks, including climbing up and down stairs. Such physical activities — walking, climbing, carrying, and lifting — are too painful for Cargill to perform on a sustained and regular basis because of her rheumatoid arthritis.

Requests for books and archival materials to be paged and retrieved occur as follows. Certain patrons of the Herbaria have stack privileges, while others do not. Cargill avers that, "few if any applicants for stack[s] privileges at the Botany Libraries . . . did not receive privileges, as the vast majority of applicants were student and staff members of the department." In any event, if a particular library visitor who did not have stack privileges requested a book or archival material, a member of the library staff would then go into the stacks to retrieve the article requested. Generally, paging and retrieval did not require immediate action. Rather, as Cargill described the process,

---

[6]The Gray Herbarium Library, the Economic Botany Library, and the Arboretum Library, which contain the main collection, are located on the second floor of the Herbaria, which is accessible by elevator. The Oakes Ames Orchid Library is on the third floor of the Herbaria and is serviced by an elevator. The Farlow Reference Library is on the first floor of an adjoining building and houses four levels of stacks connected by stairways.

"[f]ar more common[] . . . [were] reference questions from professors or students and, along with the request, a timeframe — one day to many days — within which the user needed or desired my response. As a matter of Library policy, archive visits required an appointment and/or a written request in advance."

The second activity at issue, shelving, simply means the return of books and materials to the collection stacks and the placement of new additions within the collections. While paging and retrieval are done on an as-needed basis in response to a patron's request, it appears from the record that shelving is performed on a daily basis.

C. *Cargill's interactions with Harvard regarding the two tasks and her handicap.* As previously noted, Cargill worked for the Herbaria for eleven years in various librarian positions, culminating in her promotion to lead reference librarian. From all that appears in the record, Cargill's rheumatoid arthritis did not, during the prior years of her job tenure in any of these librarian positions, negatively affect her ability to work in the Herbaria. However, given the progressively degenerative nature of rheumatoid arthritis, in early 1996, Cargill brought to the attention of various Harvard officials that the disease was, at this time, extremely painful and physically exhausting to her on those days when she was required, on a sustained basis, to carry, lift, and shelve materials, especially heavy books. During a series of meetings, commencing in January, 1996, and continuing to October, 1996, Cargill also raised the issue of having Harvard fashion an accommodation to reduce the requirements of regularly carrying books and materials, climbing the stairs, and, then, lifting these articles to the shelves in the collection stacks. Viewed in the light most favorable to Cargill, the record reflects the following material interactions between Cargill and Harvard officials concerning her disability — certain of which are challenged by Harvard, posing additional disputed issues of fact.

At a staff meeting in January, 1996, the head librarian, Judith Warnement, commented that botany books and materials were not being shelved quickly enough. Cargill explained that shelving was causing her pain and was exhausting and requested that

more of the shelving work be assigned to the student and part-time workers. That proposal was not adopted. On February 13, 1996, Cargill met with Warnement to discuss her performance goals and objectives. At that meeting Cargill discussed the issues raised by her rheumatoid arthritis. She told Warnement that she was planning to meet with Harvard's disability coordinator.[7] On February 23, 1996, Warnement continued Cargill's annual performance review. (This meeting with Warnement took place after Cargill had met with Harvard's disability coordinator.) Warnement again raised the topic of shelving and, in particular, told Cargill that the shelving cart had to be cleared at day's end, even if it meant that Cargill were required to stay late. Cargill requested that she be permitted to do the shelving first thing in the morning instead of at 5:00 P.M. Notwithstanding that Cargill's disability was clearly an issue at this point, Warnement rejected this suggestion and, then, handwrote the words "shelving/paging in timely way" in the margin of Cargill's performance plan. It appears from the record that this handwritten emendation was an addition, as the two tasks do not otherwise appear in the printed performance assessment form used for the performance evaluation.

On February 16, 1996, Cargill met with Marie Trottier, Harvard's disability coordinator. Per Trottier's request, Dr. Mark Robbins, Cargill's treating physician, submitted a letter, dated March 5, 1996, concerning her condition. In his letter, Dr. Robbins provided his diagnosis of rheumatoid arthritis and further stated that he was "writing on her behalf to seek some accommodation for her in her work place for her joint pain and functional limitations. Specifically, she should not be lifting more than ten pounds with her hands and wrists, or [be] on her feet for long periods."[8] In another encounter, Cargill told Warnement that she had met with Trottier to address a potential ac-

---

[7] Warnement stated that when Cargill advised Warnement that she had scheduled a meeting with Harvard's disability coordinator, Warnement assumed that the subject of any possible accommodation would then be handled by that person.

[8] Despite Dr. Robbins's specific diagnosis of rheumatoid arthritis and his stated opinion that an accommodation was needed, Harvard responded with a letter requesting a more detailed description of what type of accommodation the doctor proposed. There is a dispute in the record whether Dr. Robbins

commodation for Cargill's handicap and Warnement commented to Cargill that the budget did not include funds for making accommodations to the allocated work.

In addition to the disability coordinator, Cargill also met with an official from the office of human resources and with a personnel officer. However, as of April, 1996, the situation was at an impasse. Harvard's position apparently remained that Cargill was required to page books when called upon to do so and to shelve books on a daily basis. Cargill responded that she simply could not continue to do these two tasks regularly. Harvard proposed no accommodation. Instead, Harvard suggested that Cargill consider short-term disability leave. Cargill's understanding was that, during the short-term leave, the subject of a reasonable accommodation for her position would be explored. Cargill accepted the interim measure and began receiving short-term disability benefits on April 24, 1996. The short-term disability benefits ended on October 24, 1996.[9]

During the temporary disability leave, Cargill continued to press Harvard for an accommodation. To this end, on July 15, 1996, Cargill wrote to one Harvard official expressing frustration as to "why Harvard has not yet honored my request for reasonable accommodation with any appreciable response . . . . " Cargill's letter proposed alternatives and ended as follows, "[r]ight now, I am open-minded as to how this matter might be resolved. . . . I remain flexible and entertain the notion that the best idea is yet to come."

On August 8, 1996, Harvard responded to Cargill's July 15 letter. Although it was now close to seven months from the time Cargill initially requested an accommodation (with such a request for accommodation having been repeated in Dr. Robbins's March 5 letter) it appears that Harvard treated Cargill's July 15 letter as if it were a first-time request for an

received this letter because he did not respond. Leaving to one side whether the physician was the appropriate person to be called upon to fashion an accommodation, see discussion, *infra*, the point matters not in light of the subsequent events.

[9]Cargill's short-term disability payments ran out six months from commencement. She applied for long-term disability benefits, which Harvard granted after adjustment for her receipt of supplemental security income (SSI) payments.

accommodation. A human resources official, after thanking Cargill for her letter, wrote, "I am acknowledging the [July 15, 1996] letter as a written request that you would like your position as Reference Librarian in the Botany Libraries of the Harvard University Herbaria to be evaluated for reasonable accommodation for a disability." Then, on September 6, 1996, Harvard again (notwithstanding receipt of the physician's prior letter of diagnosis and reference to the need for an accommodation to address the disability) sent another letter to Dr. Robbins requesting he provide his medical diagnosis concerning Cargill's condition and the need for any accommodation.

The doctor forwarded a second letter on September 17, 1996, in which he reconfirmed the diagnosis of rheumatoid arthritis. It is interesting to note that the physician advised Harvard that he was not in a position to craft an appropriate accommodation. Specifically, he stated that "I need to make it clear at the outset that my role as a rheumatologist is in treating inflammatory arthritis and although it is common for me to have to comment on disability and function, the level of detail that you are requesting may be beyond realistic expectations because I do not observe the patient functioning at her work place." He further stated, "[Cargill] has intermittent flares of her disease that make it quite painful for her to be lifting, carrying things, walking or standing. The exact length of time depends upon the particular day, the state of her joints, how swollen and painful they are for that day, week or month." While observing that Cargill could not endure such lifting and carrying on a sustained and regular basis because of "the cumulative effect of standing, walking, lifting, bending across the day," the doctor opined that Cargill "can walk short distances . . . . can climb stairs, that she can step up on a stool, [but that] shelving by lifting her arms up over her head with objects that are more than several pounds . . . will be difficult." Ultimately, the doctor opined that Cargill could continue to work and "to perform work that is predominant[ly] sedentary and seated or desk based with limited periods of time of walking short distances [and] standing." From Harvard's perspective, Cargill's requests for desk-based work (and her acceptance of long-term disability benefits) substantiated its position that she could no longer perform the

essential functions of the job. Given the many intellectual and academic-based functions of the lead reference librarian, a reasonable fact finder could infer from the physician's letter, as well as from Cargill's letter, that she could continue to perform the academic-based functions from a desk-based position. See parts 4 and 5, *infra.*

In any event, Harvard made no reply to Dr. Robbins's September 17 letter, and for all intents and purposes, as relevant to summary judgment, the dialogue between Cargill and Harvard ended. A letter from Harvard dated October 24, 1996, noted that Cargill was applying for long-term disability benefits and stated that "consultation with you and your physician did not identify any reasonable accommodation that would enable you to perform the essential functions of your position in the Herbaria," and accordingly, Harvard was "no longer holding [her] position as Reference/Archives Librarian in the Botany Libraries of the Harvard University Herbaria."

2. *Essential functions.* General Laws c. 151B, § 4(16), does not define the term "essential functions." In giving content to the term, the Supreme Judicial Court has looked to both the Massachusetts Commission Against Discrimination (MCAD) guidelines and to Federal case law and regulations.[10] With respect to the MCAD guidelines as an informing source, the court has observed that, "[g]uidance provided by the Massachusetts Commission Against Discrimination (MCAD) . . . is also illuminating. . . . The guidelines represent the MCAD's interpretation of G. L. c. 151B, and are entitled to substantial deference, even though they do not carry the force of law." *Dahill* v. *Police Dept. of Boston,* 434 Mass. at 239. Accord *New Bedford* v. *Massachusetts Commn. Against Discrimination,* 440 Mass. at 464-465.

The pertinent MCAD guideline provides that "[t]he 'essential functions' of the job are those functions which must necessarily be performed by an employee in order to accomplish the

---

[10]In interpreting G. L. c. 151B, Massachusetts courts "consider Federal case law construing the cognate Federal unlawful discrimination statutes, unless we discern some reason to depart from those rulings." *New Bedford* v. *Massachusetts Commn. Against Discrimination,* 440 Mass. at 463 n.26. See *Dahill* v. *Police Dept. of Boston,* 434 Mass. at 237-238.

principal objectives of the job." MCAD Guidelines: Employment Discrimination on the Basis of Handicap Chapter 151B, § II.B (1998). The Federal courts define "essential functions" along similar lines. "An essential function is a 'fundamental job dut[y]' of the employment position the individual with a disability holds or desires . . . . The term does not include 'marginal functions of the position' . . . ." *Ward* v. *Massachusetts Health Research Inst., Inc.*, 209 F.3d at 34, quoting from *Laurin* v. *Providence Hospital*, 150 F.3d 52, 57 (1st Cir. 1998). 29 C.F.R. § 1630.2(n)(1) (2003).[11]

In addition to the case law, "[t]he Federal guidelines [on essential functions] can be used to guide Massachusetts [courts] in interpreting G. L. c. 151B." *Labonte* v. *Hutchins & Wheeler*, 424 Mass. at 823 n.13. While no regulatory list can totally occupy the field of judicial inquiry concerning what are or are not the essential functions of a job, the employer's judgment is to be "tested by relevant guidelines," coupled with the totality of factual information surrounding the job and its various functions. See *id.* at 822. The pertinent regulation lists certain reasons why a function may be deemed essential, including, but not limited to, the following:

> "(i) The function may be essential because the reason the position exists is to perform that function;

> "(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

> "(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function."

29 C.F.R. § 1630.2(n)(2)(i)-(iii) (2003). In addition, the regula-

---

[11]The full definition of "essential functions" in 29 C.F.R. § 1630.2(n)(1) (2003) is as follows:

"The term *essential functions* means the fundamental job duties of the employment position the individual with a disability holds or desires. The term essential functions does not include the marginal functions of the position" (emphasis in original).

tion also sets forth criteria by which evidence may be weighed to determine whether a particular function is essential. The evidentiary criteria include, but are not limited to:

"(i) The employer's judgment as to which functions are essential;

"(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

"(iii) The amount of time spent on the job performing the function;

"(iv) The consequences of not requiring the incumbent to perform the function;

"(v) The terms of a collective bargaining agreement;

"(vi) The work experience of past incumbents in the job; and/or

"(vii) The current work experience of incumbents in similar jobs."

29 C.F.R. § 1630.2(n)(3) (2003). With these regulatory guidelines setting an analytic framework, the fact finder "will need to conduct an individualized inquiry and make appropriate findings of fact." *Cox* v. *New England Tel. & Tel. Co.*, 414 Mass. at 383, quoting from *School Bd. of Nassau County* v. *Arline*, 480 U.S. at 287. See *Labonte* v. *Hutchins & Wheeler*, 424 Mass. at 822-823. Compare *Ward* v. *Massachusetts Health Research Inst., Inc.*, 209 F.3d at 35 ("resolution of the issue [of essential function] in each case requires a fact-intensive inquiry into the pattern of the [job function] and the characteristics of the job in question").

This type of factual inquiry is particularly necessary in connection with an employment position that encompasses multiplex functions, in which one or more (but not necessarily all) of the activities may be deemed essential to fulfil the fundamental and principal objectives of the position. This is precisely so with respect to the position of the reference librarian for the Herbaria — a position that involved a host of different and divisible tasks and functions, certain of which a fact

finder might determine to be essential under G. L. c. 151B, § 14(6), others not. The "determination [of essential function] should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Cox* v. *New England Tel. & Tel. Co.*, 414 Mass. at 384, quoting from *Hall* v. *United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988).

3. *The summary judgment.* Against this backdrop the question of law for appellate review is whether, "viewing the evidence in the light most favorable to [Cargill as] the nonmoving party, all material facts [i.e., that paging/retrieval and shelving are essential functions of the lead reference librarian job and that no reasonable accommodation is practicable] have been established and the moving party [Harvard] is entitled to judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. at 120. We note that, in reviewing the material facts, an individualized "inquiry is essential if [the statute] is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of [employers] as avoiding exposing others to significant health and safety risks." *Cox* v. *New England Tel. & Tel. Co.*, 414 Mass. at 383-384, quoting from *School Bd. of Nassau County* v. *Arline*, 480 U.S. at 287.

In this case, however, this individual factual inquiry was pretermitted by the allowance of summary judgment for Harvard. Based on our independent review, we determine that the record reveals sharply conflicting evidence on the essential function issue, thereby presenting genuine issues of disputed material fact for trial, in which a fair-minded jury could reasonably find that paging/retrieval or shelving were not necessary to accomplish the principal objectives of the job of reference librarian. Furthermore, the summary judgment, in its failure to address the governing legal standards and evidentiary criteria for both essential function, as well as for reasonable accommodation, rested on error of law.

4. *The conflicting evidence concerning paging/retrieval and shelving.* The disparate and conflicting record evidence, in the main, but not exclusively, appears in employment-related docu-

ments, in deposition testimony, and in affidavits of the involved parties. In addition, Cargill submitted expert evidence that paging/retrieval and shelving are not generally considered to be fundamental and necessary to accomplish the essential functions of a reference librarian in a university library system. We turn to the conflicting record evidence on these points.

In the course of canvassing the entire documentary compilation in the record, we shall cite a number of documents (including the reference librarian job description drafted by Harvard, as well as other employment-related writings and records) that give rise to conflicts in the evidence. We have previously adverted, in a general manner, to the fact that Harvard's job description for the position of the reference librarian places emphasis on academic-based research and reference activities. See part 1, *supra.* We now add further particulars.

The job description (set forth in the margin below)[12] mandates that the reference librarian possess an advanced degree of master of library science, with required coursework in botany or familiarity with botanical literature; have professional experience in the management of archives and rare books; exhibit proficiency in on-line database searching and CD ROM technology; and have at least two prior years of service in an academic setting. (It is worth noting again that Cargill has a doctorate in biology and a master's degree in library science, as well as extensive library-based experience.) The scholarly bent of the

---

[12]The job description stated as follows:

*"Required Education, Experience, Skills*: M.L.S. [master of library science]; coursework in botany and/or familiarity with botanical literature; experience with on-line searching and CD ROM technology; at least two years' library experience in an academic setting preferred; familiarity with management of archives and rare books preferred.

*"Duties & Responsibilities*: Organismic and Evolutionary Biology (OEB). Reporting to the Head Librarian of the Botany Libraries, serves the users of the Botany [L]ibraries who include faculty, staff, students, visiting scholars, and the general public. Assists in accessing books, journals, archival materials, many of which are fragile and rare, and other resources within the libraries, the University, or via interlibrary loan. Searches electronic sources when appropriate. Monitors the development of new reference tools and assists in collection development. Oversees activities within the two reading rooms. Trains and supervises other public services staff. Screens and orients new users. Manages use of the archives including routine correspondence. Represents the Libraries on appropriate University committees."

required credentials and the described job traits (as well as other evidence briefly summarized herein) are such that a reasonable fact finder might conclude that mastery of academic-based research and reference, oversight of the specialized library collections of the Herbaria, and the training of staff to serve in this academic milieu were the principal objectives and essential functions of the position, not the physical tasks of paging/ retrieval and shelving. See generally *Cox* v. *New England Tel. & Tel. Co.*, 414 Mass. 375.

Further tilting to such a perspective — and contributing to our conclusion that the record presents genuine issues of disputed material fact — is the absence of any express mention in the reference librarian job description to paging, retrieval, and shelving. (This omission, we note, is in contrast to the inclusion of these terms in job descriptions for lower library staff positions, including the reference assistant and cataloging/ public services assistant.) In fact, it was only *after* Cargill left that Harvard issued a revised reference/archives librarian job description (dated November 21, 1996) that included the requirement that the candidate have the "ability to lift oversized objects up to 30 lb[s]."

Similarly, there is no reference to paging and shelving in the printed performance review form used to evaluate Cargill's performance. Indeed, it was only on February 23, 1996, both after Cargill's disability became an issue and after a conference with the disability coordinator had been held, that, as a part of an annual review, Warnement handwrote on the preprinted performance evaluation report, "shelving/paging in timely way." These two functions do not appear in the long list of "Key Job Responsibilities" printed on the evaluation form.

On Cargill's side of the balance, from the foregoing documentary evidence, a reasonable fact finder could conclude that the academic-based functions of research and reference were the essential functions of the reference librarian job (indeed, a sine qua non for qualification as the reference librarian of the Herbaria),[13] and that the two physical tasks of paging/

[13]In this respect, we note that another document in the record, namely the job description dated February 13, 1990, for the "Library Assistant, Reference/

retrieval and shelving, which do not appear in a number of highly pertinent documents, are marginal functions.

On the other side of the balance, Harvard not only claims that its judgment as the employer is entitled to great weight,[14] but also cites certain documents in support of its judgment that paging/retrieval and shelving are essential functions. One of the documents on which Harvard heavily relies is a university-wide salary survey conducted in 1993, in which in response to question no. 44,[15] Cargill checked boxes referring to lifting and carrying objects occasionally (six percent to twenty-five percent). We have reviewed the entire questionnaire, which was designed

---

Archives" (the position one step down from the reference librarian, which Cargill held before her promotion to lead reference librarian) also emphasizes the academic aspects of this reference position in the Herbaria. This description states, "[t]he primary objective of this position is to provide reference assistance and research support to the users of the Botany Libraries' collections and archives." A fact finder reasonably could conclude these academic-based research and reference functions were, a fortiori, the "primary objective" of the job of the higher reference librarian position.

[14]Harvard asserts that "deference *must* be given to Harvard's judgment concerning the essential functions of the position" (emphasis added). However, in *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, the Supreme Judicial Court rejected the contention that whether a job function is essential "is solely the employer's judgment." *Id.* at 822. Accord *Ward* v. *Massachusetts Health Research Inst., Inc.*, 209 F.3d at 34 ("While we generally give substantial weight to the employer's view of job requirements in the absence of evidence of discriminatory animus, it is only one factor in the analysis" [citations omitted]).

[15]The stated purpose of this particular section of the salary survey, entitled "Position Environment/Physical Demands," was to "measure[] the position environment, physical requirements, visual attention, and physical demands required in this position." Question no. 44 lists fourteen different movements, including "Sitting," "Standing," "Walking," "Bending/stooping," "Crawling/kneeling," "Carrying (under 10 lbs.)," "Carrying (over 10 lbs.)," "Climbing," "Pushing/pulling," "Lifting (under 10 lbs.)," "Lifting (over 10 lbs.)." Preprinted boxes state percentage ranges from "Rarely (0-5%)," "Occasionally (6%-25%)," "Routinely (26%-50%)," "Regularly (51%-75%)," and "Constantly (Over 75%)." For the four activities of carrying under, or over, ten pounds and lifting under, or over, ten pounds, Cargill checked off "Occasionally." Harvard emphasizes the introductory line to question no. 44, which inquires: "[w]hich of the following descriptions of physical effort are required to perform the essential functions of this position?" However, we are not persuaded that either this one reference, or the entire question, taken in context, establishes, as a matter of undisputed material fact, that paging/retrieval and shelving (not mentioned in the subject question) were essential functions within the meaning of G. L. c. 151B.

to "develop[ ] a single University-wide administrative and professional staff salary structure by July 1994," and which consists of fifty-three pages of generic questions applicable to twenty-seven different entities within the university, ranging from the divinity school to the business school. While a judge at a trial may or may not consider the salary survey — or, more precisely, the single answer to question no. 44 — relevant and admissible for a fact finder to consider, the answer to this singular question did not constitute an absolute "concession" by Cargill[16] or establish as an undisputed fact that paging, retrieval, and shelving were essential functions.

Even assuming the relevancy of the question in the salary survey concerning physical activities to determining essential functions under G. L. c. 151B, § 14(6), factual disputes remain concerning what Cargill's check-offs in the boxes meant, in light of the fact that neither the salary questionnaire generally nor question no. 44 in particular were directed to, or defined by, any focus on librarian functions within the Herbaria. On these points of distinction, Cargill suggests her checked-off references for carrying and lifting cannot be read as exclusively meaning paging and shelving in the library and that, in the total work duties, these two tasks comprised less time than the generic reference to carrying and lifting in the question (and certainly did not comprise twenty-five percent of her time, which is the figure Harvard advanced at oral argument before this court, a misleading exaggeration that ignored the lesser six percent figure in the "Occasionally" definition in the record, see note 15, *supra*). Certain documents support this contention by Cargill,[17] as does the arithmetic of adding up the percentage ranges for the

[16]Similarly, there was error in the judge's memorandum of decision characterizing as a "concession" Cargill's failure to object to the addition of the words "paging" and "shelving" to a proposed revision of the job description in a memorandum that Harvard drafted and forwarded to Cargill well *after* she identified her disability and requested an accommodation.

[17]For example, one document relating to the assistant reference librarian position, which Cargill held prior to becoming lead reference librarian, estimates that the time to be spent accessing (a term Harvard contends is synonymous with paging/retrieval) material will be one hour, stating the access function and time estimate as follows: "Assist non-department users in identifying and accessing materials from the collections and providing appropriate referrals when necessary (1 hour)."

fourteen entries, which do not compute to a mathematically logical work week. Simply put, this one question and answer do not dispel disputed factual issues and do not bear the great weight and depth afforded them as a main anchor to the allowance of summary judgment.

Harvard also contends that the job description for the reference librarian should be construed "implicitly" to include paging/retrieval and shelving. These phrases, Harvard contends, are synonymous with the word "accessing," which appears in the job description. See note 12, *supra*. On the state of the record, that, too, is not only a debatable point, but is sharply contested in the submissions of the parties and is a point of conflicting evidence.[18] (See, e.g., the expert submission, further described below, that "accessing" generally "requires extensive knowledge of search and research tools available for finding sources of information in a given field").

Cargill also offered expert testimony by affidavit of Dr. Gerald Miller, associate professor at Simmons College Graduate School of Library and Information Science, who had more than fifteen years of professional and academic experience in the field of library science. Dr. Miller opined that "neither paging books and materials nor shelving books and materials is or should be considered an 'essential' or 'core' function of the Reference Librarian position." He also stated it is "uncommon" for a reference librarian to "physically retrieve material," a task most often delegated to work-study or other nonprofessional employees. This expert opinion was not rebutted or even controverted.

The conflicts in the record evidence summarized above preclude Harvard from prevailing on its summary judgment motion as matter of law. Thus, ultimately, it is the fact finder who will be "entitled to weigh [the] evidence in their determination

---

[18]In any event, even were we hypothetically to translate the word "accessing" into the words "paging/retrieval and shelving," and were to incorporate these two translated words into the job description, the inclusion would not, standing alone, establish beyond peradventure, as Harvard urges, that paging/retrieval and shelving were essential functions. "[E]ssential function [is to be] determined by more than an employer's job description." *Labonte* v. *Hutchins & Wheeler*, 424 Mass. at 822, citing *Cox* v. *New England Tel. & Tel. Co.*, 414 Mass. at 383-384.

of what were the essential functions of the position." *Labonte* v. *Hutchins & Wheeler*, 424 Mass. at 823.

5. *Reasonable accommodation.* Even were there not a factual dispute regarding whether book paging/retrieval and shelving were essential functions of Cargill's job, the inquiry does not end there. Given the remedial purpose of preserving the employment status of a qualified handicapped person by making reasonable accommodations, the statute requires a court to measure whether the employer's decision "reflect[s] a well-informed judgment grounded in a careful and open-minded weighing of the risks and alternatives. . . ." *Hall* v. *United States Postal Serv.*, 857 F.2d at 1079, quoting from *Arline* v. *School Bd. of Nassau County*, 772 F.2d at 764-765.[19] No such weighing was conducted in this case before summary judgment entered. The Supreme Judicial Court has held that under G. L. c. 151B, § 4(16), "the burden of proving an inability to accommodate always rests with the employer, . . . but that burden is only triggered '[a]fter a plaintiff produces sufficient evidence to make at least a facial showing that reasonable accommodation is possible.' " *Cox* v. *New England Tel. & Tel. Co.*, 414 Mass. at 386 n.3, quoting from *Gardner* v. *Morris*, 752 F.2d 1271, 1280 (8th Cir. 1985).

Even if an accommodation is presented, an employer may still prevail by establishing either that the proposed accom-

[19]The relevant MCAD guideline states that "[t]he duty to provide reasonable accommodation applies to all aspects of employment, and is intended to reduce work-related barriers that are related to an individual's handicap." MCAD Guidelines: Employment Discrimination on the Basis of Handicap Chapter 151B, § II.C (1998). The guideline then sets forth a nonexhaustive list of possible reasonable accommodations and includes several that might have been pertinent to Cargill's situation, such as modifying her work schedule; modifying "when and how an essential job function is performed" (were it found to be such a function); "re-assigning non-essential job functions"; and other suggestions. *Ibid.* The guideline also states: "If a person with a handicap requests but cannot suggest an appropriate accommodation, the employer and the individual should work together to identify one. The employer may direct the employee to provide reasonable documentation from a health care provider of the existence of a handicap and the need for reasonable accommodation." *Ibid.* This documentation was provided, but it appears that the process did not continue beyond that point. That the employer has a responsibility to identify a reasonable accommodation was recently confirmed in *Calero-Cerezo* v. *United States*, 355 F.3d 6 (1st Cir. 2004).

modation would cause an undue hardship or that it would be otherwise unreasonable. See *Cox*, 414 Mass. at 383. See also *US Airways, Inc.* v. *Barnett*, 535 U.S. 391, 401-402 (2002). The summary judgment record reflects that Cargill offered sufficient evidence to make a facial showing that a reasonable accommodation was possible, including, but not limited to, utilization of the available student workers and part-time staff employees, and the use of shelving carts. On the basis of this record, summary judgment was not warranted.

6. *The MERA claim.* Summary judgment also entered for Harvard on the MERA claim under G. L. c. 93, § 103. In effect, MERA incorporates the rights against handicap discrimination protected by art. 114 of the Amendments to the Massachusetts Constitution. However, MERA does not create an independent right to vindicate an alleged wrong that can otherwise be redressed under G. L. c. 151B. *Green* v. *Wyman-Gordon Co.*, 422 Mass. 551, 557-558 (1996). "[W]here applicable, G. L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections." *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 586 (1994). Accordingly, so long as it is determined "that G. L. c. 151B is or was available to the plaintiff, the plaintiff would have no viable c. 93, § 103, claim under the teaching of *Charland*." *Agin* v. *Federal White Cement, Inc.*, 417 Mass. 669, 672 (1994).

The judgment is vacated as to the two counts of the complaint brought under G. L. c. 151B. The judgment dismissing the count pleaded under G. L. c. 93, § 103, is affirmed. The case is remanded to the Superior Court.

*So ordered.*