Gants, J.
The plaintiff Michael Mammone (“Mammone”) has filed this action against his former employer, the President and Fellows of Harvard College (“Harvard”), alleging that Harvard, when it fired him, engaged in unlawful employment discrimination based upon his disability, in violation of G.L.c. 151B, §§1(16), 4 and G.L.c. 93, §103. Harvard now moves for summary judgment on all counts. After hearing, for the reasons stated below, Harvard’s Motion for Summary Judgment is ALLOWED.
BACKGROUND
In evaluating a motion for summary judgment, I must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmoving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Consequently, the facts stated below are presented in the light most favorable to Mammone and should not be misunderstood as findings of the Court.
Mammone began his employment at Harvard in August 1995 as a part-time Staff Assistant at the Peabody Museum (the “Museum”) in the Faculty of *240 Arts and Sciences. In January 1996, Mammone became a permanent employee. His duties and responsibilities included acting as a receptionist for the Museum, opening and closing the Museum, welcoming and directing visitors, collecting admission fees, and assisting with routine security and safety measures. Throughout his employment with Harvard, Mammone received positive performance reviews and regular salary increases.
Mammone was first diagnosed as having bipolar disorder, sometimes referred to as manic-depressive disorder, in 1987. During his occasional periods of mania, Mammone would become paranoid, agitated, hyperactive, and irrational. However, until the events that led to his termination, Mammone’s bipolar disorder had not adversely affected his work.
On August 18, 2002, Mammone established a website that was critical of Harvard’s pay scale and of the union. While at work, Mammone used his personal laptop to update the website. Mammone also distributed flyers at work that promoted the website. Shortly after creating the website, Mammone began to experience a severe manic episode. He spoke to co-workers in a loud and animated fashion about Harvard’s wage policies. He also invited them to view the website at his desk, which served as the reception desk in the main lobby of the Museum. In the main Museum lobby, Mammone sang, clapped, and danced to protest songs that were posted on the website and played on his laptop. At times, his co-workers joined him in song. On August 22, Michelle Piponidis (“Piponidis”), one of the Museum’s supervisors, asked him not to bring his laptop to the Museum in the future.
On August 29, Mammone discovered that his house keys were missing from his bag. Convinced that they had been stolen as part of a conspiracy against him, he spent the night at the YMCA in Boston. The following morning, August 30, Mammone screamed for help from the window of his room at the YMCA, yelling for the police to help protect him from union “goons” sent to get him. After police arrived, Mammone was sent by ambulance to Boston Medical Center. Throughout the day, Mammone was administered Ativan, a drug which triggered an allergic reaction and heightened his mania. Mammone was later transferred to McLean Hospital and kept overnight for observation. Upon his insistence, Mammone was released the next morning.
Mammone returned to work on September 2, 2002. On September 2 and 3, he continued to speak loudly to co-workers about Harvard’s pay scale, danced and clapped around and in front of his desk, and sang protest songs in the main lobby. On September 3, Piponidis received two e-mail messages from staff at the Museum expressing their concern for Mammone and his unusual behavior. Castle McLaughlin (“McLaughlin”), Associate Curator of North American Ethnography at the Museum, expressed his concern that Mammone’s recent behavior was “irrational” and “bordered on the bizarre.” McLaughlin stated that Mammone recently reported that union “goons” had broken into his car and home, and that he had been to two hospitals over the previous weekend. McLaughlin stated that Mammone seemed to have “gone over the edge” and needed medical attention. Also on September 3, Catherine Linardos (“Linardos”), a staff member of the Public Programs Office, expressed concern about Mammone’s disruptive behavior. Linardos stated that Mammone made accusations that morning about “being attacked,” and complained that someone had stolen his keys and broken into his home and car. Linardos said that Mammone’s “belligerent attitude is not only affecting Peabody staff, but also visitors to the Museum.” She doubted that calm conversation with him could help, because “his emotions seem to be out of control.”
Towards the end of the work day on September 3, Mammone was called by his Union representative, Joie Gelband (“Gelband”), who asked if Piponidis had requested him to go to a meeting the next day with Elaine Pridham (“Pridham”) of the Office of Labor Relations. Mammone said he had not been told of any such meeting. Gelband said he should not worry, because they were obligated to give him 24 hours notice of such a meeting. Mammone inferred from this discussion that the purpose of such a meeting was to fire him.
On September 4, Mammone arrived at work dressed in a brightly-colored, traditional East Indian dress with necklaces, bracelets, and rings. That morning, he spoke loudly on the telephone to the American Civil Liberties Union (“ACLU”) and members of his family from his desk in the Museum lobby. When Piponidis came by his desk and asked him to join her in the conference room, Mammone thought her purpose was to fire him. He refused to come by flicking his hand and saying, “Pssst, Get away from me. You’re evil.” Shortly thereafter, Mary Reynolds (“Reynolds”), the Museum’s Human Resources Administrator, Piponidis, and two Harvard plain-clothed police officers approached Mammone at his desk while he was speaking on the telephone with his sister. As they came near, Mammone yelled that they were coming to get him, to take him away. He then held the telephone towards Reynolds and invited her to tell his sister why they were having him arrested. She took a step back, and Mammone said the same thing to one of the two Harvard police officers. One of the officers slammed the telephone down, and in a loud voice said that Reynolds and Piponidis wanted him to leave and go tomorrow to a meeting at the Office of Labor Relations. Mammone said that it was up to them to tell him that, since he was not his boss. The police officer responded that they were present while he told him that. He added that he wanted Mammone to leave now, and said he was going to warn him five times, and if he still did not leave, he was going to arrest him for trespassing. After the third warning, Mammone left his desk *241 and sat in a spot on the floor where a totem pole previously had stood. After three more warnings, the police officer arrested him and placed him in handcuffs. Mammone shouted that he needed witnesses, and lay limp on the floor, requiring the police to drag him out of the Museum and into the police cruiser. Mammone was booked at the Harvard police station and later brought to Cambridge District Court on charges of trespassing and disorderly conduct.[1]
Later that day, Piponidis wrote a letter to Mammone which began, “This letter will serve, first of all, as a final written warning.” She instructed him not to return to the Museum until he had a meeting with Elaine Pridham of Labor and Employee Relations, scheduled for September 10, 2002. The letter twice stated that Mammone would be treated as a trespasser should he return to the Museum prior to his meeting with Pridham. The letter summarized his recent conduct, which she wrote “has become progressively more and more disruptive and threatening to your colleagues as well as museum visitors,” and was “completely unacceptable.” She recommended that he take advantage of the Faculty and Staff Assistance Program which provides free, confidential, and anonymous short-term counseling and referral services.
Piponidis’s September 4 letter was not received by Mammone before he was released from custody. A police sergeant had simply told him while he was being arrested not to return “here” and to go the Office of Labor Relations the next day. Mammone understood “here” to mean the Peabody Museum lobby, and believed he was free to go to the Museum of Natural History, even though it adjoins the Peabody Museum and gives visitors complete access to the Peabody Museum. He entered the Museum of Natural History through the front entrance and used the pay telephone in the staircase landing near the lobby. While he was on hold during a telephone call with the ACLU, he noticed that Piponidis had approached him and told him that he was not supposed to be there. Mammone hung up the telephone and Reynolds appeared behind Piponidis in the lobby near where Mammone stood on the staircase landing. He pointed at them, and stated, “You fucking whack bitches are going down.” He then walked past the two women and left the building.
On September 5, Piponidis wrote a second letter to Mammone that expressly superseded the letter of September 4. The letter notified him that his return to the Museum building and his conduct towards her and Reynolds, in addition to the conduct described in the September 4 letter, “is grounds for immediate discharge, effective at the end of business yesterday— September 4, 2002.” The letter also stated that any attempt by him to enter the Peabody Museum or the Harvard Museum of Natural History would result in a trespassing charge.
Mammone continued to experience symptoms associated with his manic episode. As a result, he did not return to his home for one week following September 4. During his absence, Gelband, as Mammone’s Union representative, spoke with Harvard administrators about postponing the processing of Mammone’s termination so that he could apply for short-term disability benefits. If he received short-term disability benefits, he would receive 70 percent of his base pay and could continue to receive his Harvard health care benefits for a period not to exceed six months. Gelband also sought to persuade Harvard to reinstate him when his short-term disability benefits expired, provided he was fit for duty.
Harvard agreed not to process his termination until September 13, 2002 in order to allow him to apply for short-term disability benefits. In order to qualify for these benefits, Mammone signed a certification declaring that he was “unable to work for medical reasons . . .” Since Mammone applied for short-term disability benefits on September 9, 2002, Harvard agreed not to process his termination, because it was required that he be a current employee in order for him to receive short-term disability benefits. Indeed, on September 13, 2002, a Harvard Personnel Officer certified that Mammone “is a current employee” of Harvard and therefore is eligible for short-term disability coverage. Mammone’s application for short-term disability benefits was allowed on September 23, 2002.
In a letter to Mammone dated October 17, 2002, which expressly superseded the September 5 letter, Piponidis confirmed that she had “agreed to delay the effective date of your termination of your appointment to allow you an opportunity to apply for Short-term Disability (STD) benefits.” Piponidis added, “Therefore, effective the day the STD benefits end, your employment with Harvard University and the Harvard Museum of Natural History will terminate.” Piponidis reiterated that any attempt by Mammone either to enter the Museum or disrupt University business at another location on campus “will result in a charge of trespassing.”
On October 22, 2002, Dr. Irving Allen (“Dr. Allen”), a psychiatrist, provided a letter to re-certify Mammone for continued receipt of short-term disability benefits. His letter recommended an additional 60-day period and indicated that Mammone’s progress was good for recovery. On December 9,2002, Mammone’s attorney, Jennifer B. Reiker (“Reiker”), sent a letter to Harvard declaring that she had been retained to represent Mammone in an action for his termination pursuant to the Americans with Disabilities Act, G.L.c. 15IB, §4(16), and the Family and Medical Leave Act. Reiker further stated that “(n]o reasonable accommodation, such as time off in which to get better, has been offered to him.” On January 29 and 30, 2003, respectively, Sarah Kelly (“Kelly”), a licensed social worker, and Dr. Allen provided re-certification letters. The letters recommended an additional 30-45 day period of leave.
*242 Mammone’s short-term disability benefits expired on March 5, 2003. His termination from employment became effective on March 7, 2003. A March 10, 2003 medical record authored by Dr. Allen indicates that Mammone that day was “calm,” "articulate,” “reflective,” and “taking the best constructive action he can around looking for employment.” At no time prior to his termination did Dr. Allen or any other psychiatrist or psychologist communicate to anyone at Harvard that Mammone was fit to return to work.
DISCUSSION
To prevail on summary judgment, the moving party must establish that there is no genuine issue of material fact on every element of a claim and that it is entitled to judgment on that claim as a matter of law. See generally Mass.R.Civ.P. 56(c); Highlands Insurance Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997). Where, as here, the party opposing summary judgment has the burden of proof at trial, the moving party is entitled to summary judgment if it “demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party’s claim.” Id. It is sufficient to demonstrate that “proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
Mammone relies on two alternative theories of liability for employment discrimination on the basis of handicap: (1) disparate treatment employment discrimination; and (2) failure to provide reasonable accommodation. Under both theories, Mammone bears the burden of proving that he is a “qualified handicapped person,” defined in G.L.c. 151B, §1(16) to mean “a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to the handicap.”
Harvard contends that Mammone cannot establish that he is a “qualified handicapped person” because of his misconduct. An employee is not a “ ‘qualified handicapped person’ within the meaning of G.L.c. 15 IB and therefore is not entitled to the protection of the statute” if he engages in conduct “significantly inimical to the interests of his employer and in violation of the employer’s rules.” Garrity v. United Airlines, 421 Mass. 55, 63 (1995). This is true even where an employee’s disability arguably causes the misconduct in question. “A disabled individual cannot be ‘otherwise qualified’ for a position if he commits misconduct which would disqualify an individual who did not fall under the protection of the statute.” Garrity, 421 Mass. at 62-63, quoting Wilbur v. Brady, 780 F.Sup. 837, 840 (D.D.C. 1992). “Nothing in G.L.c. 151B suggests a legislative intent that a lower standard of qualifying conduct should apply to handicapped employees than applies to those without handicap.” Garrity, 421 Mass. at 63. See also LaRosa v. United Parcel Service, Inc., 23 F.Sup.2d 136, 146 (D.Mass. 1998) (interpreting Garrity to mean that “when a handicapped person engages in misconduct that makes him or her unable to perform the essential functions of the job, the person is not a qualified handicapped individual”).
To understand the precedential consequence of Garrity, it is necessary to look carefully at the facts of that case. Garrity was a Customer Service Representative with United Airlines, who was also “an alcoholic with a psychological addiction.” Garrity v. United Airlines, 421 Mass. at 56. One morning, while assigned to the international desk, she handed out packets to international passengers that contained “chits” which could be exchanged on the flight for a free drink or headset. Id. at 57. Some of the passengers gave the “chits” back to Garrity. Rather than returning them to her employer, Garrity kept them for her own personal use. Id. Garrity believed she could keep the “chits” because there was no company procedure providing for their return. Id. That night, Garrity and a fellow employee flew to Hawaii, traveling on “pleasure passes” that United Airlines provided to its employees to allow them to travel at a reduced rate. Id. Garrity used the stolen “chits” to purchase drinks on the flight, became drunk, and began to act up, causing the flight attendants to stop serving her any more alcoholic beverages. Id. She demanded “excessive service and attention,” made comments about “what a pain premiers [frequent flyers] are,” and complained at the bar about how United “screws us,” which made it apparent to the surrounding passengers that she was a United employee. Id. Garrity was later terminated for violating company policies by taking the drink “chits,” using them on a “pleasure pass,” and becoming intoxicated on the flight. Id. at 59.
Garrity filed suit against United Airlines alleging handicap discrimination, claiming that she was fired because of her handicap — alcoholism. Id. at 55. In support of her claim, she offered the letter of the doctor who evaluated her following United’s referral, in which he wrote, “Because of her alcoholism she could no more be held responsible for use of drink chits than a cocaine addict could be expected to reject available cocaine, or a gambler to resist one last chance at restoring a financial loss.” Id. at 58 n. 1. At the doctor’s deposition, he declared that there was “no question that Ms. Garrity was addicted to alcohol.” Id. He went on to explain that “addiction implies an irresistible compulsion .. .” and that she was unable to resist the chits because she was addicted to alcohol. Id. He added, “It’s like putting the drink in her hand.” Id. Consequently, when the court considered United *243 Airlines’ motion for summary judgment, there was abundant evidence in the record that her misconduct was directly caused by her alcoholism. Therefore, when the court considered this motion, it was obliged to accept that she was terminated solely because of misconduct which directly arose from her alcoholism — her alleged handicap.
In affirming the grant of summary judgment in Garrity, the Supreme Judicial Court ruled that, if an employee engages in misconduct that is “significantly inimical to the interests of his employer-and in violation of the employer’s rules,” she is not a qualified handicapped person and therefore not entitled to the protection furnished by G.L.c. 15IB, even if the misconduct was caused by her handicap. Not every act of misconduct is sufficient to trigger this bar; it must be “egregious misconduct.” Id. at 62, quoting Little v. FBI, 1 F.3d 255, 258-59 (4th Cir.1993). See also LaRosa v. United Parcel Service, Inc., 23 F.Sup.2d at 145-46 (refusing to read Garrity to bar a claim of handicap discrimination whenever the termination was due to any misconduct). The question, here, is whether Mammone’s misconduct crossed the line into the realm of “egregious misconduct.”
This Court understands that misconduct crosses that line when:
1. The employer terminates the employee promptly after the misconduct, demonstrating the employer’s subjective belief that no person who engaged in such misconduct may retain his position with the employer; and
2. The misconduct is so egregious that no employer should reasonably be required to retain such an employee, even if the misconduct were caused solely by a handicap and even if the employee, with or without reasonable accommodation, otherwise could perform the essential functions of the job.
As to the second element, in Garrity, the Supreme Judicial Court effectively found that United Airlines reasonably should not be required to retain an employee who kept the drink “chits” (even when there was no explicit policy as to what should be done with returned “chits”), used them to get drunk on a United flight she was on using a “pleasure pass,” and criticized United’s treatment of its employees in front of other passengers. Mammone’s misconduct is plainly more egregious than that committed by Garrity. Garrity’s misconduct occurred on a single day; Mammone’s misconduct spanned at least three days. Garrity did not ignore the specific instructions of her superiors. Mammone refused to obey his superior when she told him to come with her to a conference room; he instead flicked aside her request and called her evil. Moments later, he refused to leave the Museum when he was directed to by the Harvard police, in the presence of two of his superiors; he instead chose to sit down in the lobby of the Museum, preferring to be arrested and dragged away. Most importantly, Garrity never threatened any of her superiors or colleagues; Mammone pointed at two of his superiors and told them, “You fucking whack bitches are going down.” In short, if the misconduct in Garrity crossed the line, as the Supreme Judicial Court has found, Mammone’s misconduct also crosses that line, even if the entirety of his misconduct arose from his bipolar disorder.
Mammone, however, contends that there is a genuine dispute of fact as to the first element, because he was not formally terminated from employment until March 7, 2003, more than six months after his misconduct. Certainly, if there were truly a genuine factual dispute as to whether Harvard had reserved judgment on whether to terminate Mammone’s employment until six months after the misconduct, then summary judgment would not be appropriate because there would be a triable issue as to whether Harvard considered his misconduct so egregious as to bar him from its employ. An employer may not “pocket” an employee’s misconduct, allow him to continue to work, and then invoke Garrity to defeat a handicap discrimination claim arising from a subsequent termination. This Court, however, finds that there is no genuine factual dispute that Harvard made a final decision to fire Mammone on September 5, 2002, and simply agreed to postpone the effective date of his termination to allow him to apply for and receive short-term disability benefits. There is no evidence that Harvard revoked its decision to terminate or agreed to revisit that decision when Mammone’s short-term disability benefits had expired.
Mammone effectively concedes that Harvard had fired him on September 5, 2002 and agreed merely to postpone the processing of his termination until he had exhausted his short-term disability benefits. On December 9, 2002, roughly four months before the termination became effective, Mammone’s attorney wrote a letter to Harvard complaining that he had been terminated because of his psychological disability, with the termination becoming effective at the conclusion of his period of short-term disability. In his deposition, Mammone testified that Gelband, his Union representative, succeeded in persuading Harvard not to process his termination so that he could apply for short-term disability benefits, but did not succeed in persuading Harvard to reinstate him when his benefits expired if he was deemed fit for work. Piponidis’s October 17, 2002 letter makes clear that Harvard had simply agreed to delay the effective date of his termination until his short-term disability benefits ended; it left no doubt that the decision had already been made to terminate him on that date.
The only evidence in the summary judgment record that arguably reflects that Harvard had deferred any decision regarding his termination until the expiration of his period of short-term disability is a handwritten notation on a Harvard form terminating Mammone’s employment which reads:
*244 get this going!
Elaine Pridham will have that info
if yes, STD
STD 9/13
if not — Term eff. 9/4 — [not terminating him] Julie Stanley said if he applied for STD we would not term him at all
Mammone contends that this document permits the reasonable inference that Harvard had decided not to terminate him if he applied for short-term disability benefits. However, this Court finds, viewing this document in context and as part of the totality of the evidence, that such an inference would not be reasonable and that this document does not give Mammone a “reasonable expectation” of proving this essential element of his case. See Kourouvacilis v. General Motors Corp., 410 Mass. at 716. This document was explained in a note to the file from Mary Reynolds of Harvard dated October 23, 2002:
A form was prepared to activate Michael Mammone’s termination on 9/5/02. The FAS HR Office [Faculty of Arts and Sciences Human Resources Office] requested that I not process the form until 9/13. This was to give Michael the opportunity to apply for Short-Term Disability. Michael did apply. Therefore, the termination form in this package was not processed.
All the other evidence confirms the accuracy of this description of events: Harvard agreed not to process his termination to allow him to apply for short-term disability benefits, which he could not receive if he were already terminated, and to postpone his ultimate termination until the expiration of the short-term disability period. There is no evidence to indicate that Harvard had abandoned or agreed to revisit its decision to terminate Mammone’s employment.
The fact of the matter is that Harvard cut Mammone a break by agreeing to postpone his termination so that he could apply for and receive short-term disability benefits, which effectively allowed him for six months to remain on the Harvard health care plan without having to make COBRA payments and to receive 70 percent of his base pay. If this Court were to find that Harvard cannot enjoy the benefit of the Garrity holding because it agreed to postpone the effective date of his termination, this Court essentially would be punishing Harvard for giving a mentally ill employee this break. The adage, “No good deed goes unpunished,” may too often describe the sad state of the world but it should not become a principle of law. To deny Harvard the benefit of Garrity here would create a precedent that employment lawyers would rely upon to advise employer clients that they should refuse to give this break to similarly situated employees who engage in misconduct caused by mental illness, lest they risk losing their strongest defense to a handicapped discrimination claim. The law should not discourage employers from giving mentally ill employees the break that Harvard gave Mammone, which pragmatically allowed him to enjoy six months of psychiatric care he otherwise could not afford and postponed the financial hardship that would have resulted from his termination.
This Court, therefore, concludes that Harvard has established beyond reasonable dispute each of the two elements needed to prove that Mammone’s misconduct crossed the line into the realm of “egregious misconduct” and that Mammone, as a consequence, has no reasonable expectation of proving that he was a “qualified handicapped person” within the meaning of G.L.c. 151B. Harvard’s motion for summary judgment on Mammone’s c. 15 IB claim must therefore be allowed.
Mammone’s handicap discrimination claim under the Massachusetts Equal Rights Act (“MERA”), G.L.c. 93, §103, fares no better. MERA “incorporates the rights against handicap discrimination protected by art. 114 of the Amendments to the Massachusetts Constitution.” Cargill v. Harvard Univ., 60 Mass.App.Ct. 585, 604 (2004). Subsection (a) of the act states that “[a]ny person within the commonwealth, regardless of handicap ... as defined in chapter one hundred and fifty-one B, shall, with reasonable accommodation, have the same rights as other persons to make and enforce contracts, inherit, purchase, lease, sell, hold and convey real and personal property, sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, including, but not limited to, the rights secured under Article CXtV of the Amendments to the Constitution.” G.L.c. 93, §103(a). Since MERA defines “handicap” by referring to the definition in c. 15IB, if Mammone is not a “qualified handicapped person” under c. 15 IB, he cannot enjoy the protections against handicap discrimination set forth in either MERA or c. 151B. Summary judgment, then, must also be granted on Mammone’s MERA claim.[2]
ORDER
For the reasons stated above, the defendant’s motion for summary judgment is ALLOWED. Judgment shall be entered on behalf of Harvard, with statutory costs.

 Mammone has since been acquitted of these charges, by reason of his mental state at the time of arrest.

 In view of this result, this Court need not resolve whether c. 15 IB is the exclusive remedy for claims of handicap discrimination arising out of employment or whether a separate claim may be brought under MERA. Compare Cargill v. Harvard Univ., 60 Mass.App.Ct. at 604 (“MERA does not create an independent right to vindicate an alleged wrong that can otherwise be redressed under G.L.c. 151B,” citing Green v. Wyman-Gordon Co., 422 Mass. 551, 557-58 (1996)) with Jancey v. School Committee of Everett 421 Mass. 482, 497 (1995) (G.L.c. 151B precludes other claims for the “complained-of acts of the employer” only where those acts are (1) “among those ‘declared unlawful by section four,’ ” and (2) “the procedure provided in c. 151B is ‘pending,’ ” citing G.L.c. 151B, §9).