# MICHAEL MAMMONE *vs.* PRESIDENT AND FELLOWS OF HARVARD COLLEGE.

Middlesex. January 4, 2006. - May 12, 2006.

Present: GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Employment,* Discrimination, Termination. *Anti-Discrimination Law,* Employment, Handicap, Termination of employment. *Practice, Civil,* Summary judgment. *Federal Rehabilitation Act. Massachusetts Commission Against Discrimination. Words,* "Qualified handicapped person."

This court concluded that a handicapped employee suffering from bipolar disorder, who was terminated for egregious workplace misconduct that was sufficiently inimical to the interests of his employer that it would have resulted in the termination of a nonhandicapped employee, was not a qualified handicapped person within the meaning of G. L. c. 151B, and therefore was not entitled to the protection of that statute, where the reasoning of *Garrity* v. *United Airlines, Inc.,* 421 Mass. 55 (1995), which held that nonhandicapped and handicapped employees who engage in egregious workplace misconduct are subject to the same standard, was not limited to cases involving misconduct resulting from drug or alcohol dependence, and where no legislative intent to create different protections against discrimination to persons based on the form of their disability could be discerned. [665-680] GREANEY, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department on March 26, 2003.

The case was heard by *Ralph D. Gants,* J., on a motion for summary judgment, and entry of judgment dismissing the plaintiff's complaint was ordered by *Raymond J. Brassard,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Betsy L. Ehrenberg (Rebecca G. Pontikes* with her) for the plaintiff.

*John P. Coakley (Richard J. Riley* with him) for the defendant.

The following submitted briefs for amici curiae:

*Beverly I. Ward & John Lozada* for Massachusetts Commission Against Discrimination.

*Susan Stefan* for Center for Public Representation & others.

CORDY, J. On March 7, 2003, Harvard University terminated the seven-year employment of Michael Mammone. Mammone, who suffers from bipolar disorder and claims that he was terminated due to his mental disability, brought suit against the President and Fellows of Harvard College (university) under the Commonwealth's employment discrimination statute, G. L. c. 151B, § 4 (16),[1] and Equal Rights Act, G. L. c. 93, § 103.[2] Relying principally on this court's decision in *Garrity* v. *United Airlines, Inc.*, 421 Mass. 55 (1995) (*Garrity*), a judge in the Superior Court granted the university's motion for summary judgment, concluding that, because of his misconduct in the workplace, Mammone could not reasonably expect to prove that he was a "qualified handicapped person," a required showing for protection under both statutes.

A "qualified handicapped person" is one "who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap."[3] G. L. c. 151B, § 1 (16). In granting summary judgment, the judge found that the workplace misconduct that led to Mam-

---

[1] General Laws c. 151B, § 4 (16), makes it unlawful for an employer to "dismiss from employment or refuse to . . . rehire . . . or otherwise discriminate against, because of his handicap, any person alleging to be a *qualified handicapped person*, capable of performing the essential functions of the position involved with reasonable accommodation" (emphasis added). According to G. L. c. 151B, § 1 (16), a "qualified handicapped person" is "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap." Therefore, G. L. c. 151B, § 1 (16), is applicable only to persons who both allege that they are and actually are qualified handicapped persons, i.e., they must (a) allege that they could perform the essential functions of a particular job with (or without) reasonable accommodations to their handicap, and (b) actually be able to do so.

[2] General Laws c. 93, § 103, "incorporates the rights against handicap discrimination protected by art. 114 of the Amendments to the Massachusetts Constitution." *Cargill* v. *Harvard Univ.*, 60 Mass. App. Ct. 585, 604 (2004). This statute relies on the definition of handicap "as defined in [G. L. c. 151B]." G. L. c. 93, § 103 (*a*). Mammone must therefore be a "qualified handicapped person" for G. L. c. 93, § 103, to apply to him.

[3] We refer to handicap, disorder, disease, and disability interchangeably in this opinion.

mone's termination was egregious and sufficiently inimical to the interests of his employer that it would have resulted in the termination of a nonhandicapped employee. In these circumstances, the judge concluded, it would be impossible for Mammone to show that he was "capable of performing the essential functions" of his job. Mammone appealed, and we transferred the case to this court on our own motion.

Mammone contends that the reasoning of *Garrity* — that a handicapped employee who engages in egregious workplace misconduct can be held to the same standard as a nonhandicapped employee who engages in similar misconduct — should be strictly limited to cases involving misconduct resulting from drug or alcohol dependence (as opposed to other handicaps). We conclude otherwise. Nothing in the language we used in *Garrity* suggests that our holding was meant to be so narrow, and we do not discern any legislative intent to create a distinction that would provide different protections against discrimination to persons suffering from one form of handicap (alcoholism) than the protections provided to persons suffering from other disabilities. Because we conclude that *Garrity* applies to all employment discrimination cases brought under G. L. c. 151B, § 4 (16), and G. L. c. 93, § 103, regardless of the type of handicap underlying the workplace misconduct, we affirm the grant of summary judgment.[4]

1. *Factual background.* We recount the facts in their light

---

[4]In his dissent, Justice Greaney asserts that our holding "excludes from the scope of G. L. c. 151B protection an entire category of persons with mental illnesses . . . whose symptoms include occasional displays of inappropriate, and sometimes bizarre, behavior." *Post* at 681. This is incorrect. Both *Garrity* v. *United Airlines, Inc.*, 421 Mass. 55 (1995) (*Garrity*), and our holding today only reach employees who engage in egregious workplace misconduct. Neither case would allow an employer to take adverse action against a handicapped employee for an incident of bizarre or inappropriate behavior caused by his handicap that does not rise to this level. See *Garrity, supra* at 62, quoting *Little* v. *Federal Bur. of Investigation*, 1 F.3d 255, 258-259 (4th Cir. 1993) ("employer . . . must be permitted to terminate its employee on account of *egregious misconduct*, irrespective of whether the employee is handicapped" [emphasis added]). See also *infra* at 679-680 ("a handicapped employee who engages in *egregious misconduct*, sufficiently inimical to the interests of his employer [and in violation of the employer's rules] that it would result in the termination of a nonhandicapped employee, . . . is not entitled to the protection of [the] statute") (emphasis added). Thus, Justice Greaney's hypothetical employee who has an epileptic seizure at work, see *post* at note 4, cannot

most favorable to Mammone. See, e.g., *Joslyn* v. *Chang*, 445 Mass. 344, 345 (2005); *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass 117, 120 (1991), citing Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). Mammone worked as a staff assistant at the university's Peabody Museum (museum) from January, 1996, until his termination on March 7, 2003.[5] He was usually stationed at the museum's receptionist desk in the main lobby. Among other responsibilities, Mammone was required to direct individual visitors and tour groups to destinations inside the museum, as well as answer any questions such guests might have. In this position, Mammone had significant contact with the public.[6]

Mammone suffers from bipolar disorder.[7] This mental disease manifests itself in occasional periods of mania (of which paranoia, agitation, hyperactivity, and irrationality are symptoms) and occasional periods of depression. Although Mammone was diagnosed with bipolar disorder in 1987, there is no evidence that, previous to the incidents at issue in this case, his mental disease ever negatively affected his ability to perform his workplace duties. Indeed, there is scant evidence that any of Mammone's supervisors or coworkers knew of Mammone's health problems before the events in question.[8] During the course of his employment, Mammone received both annual salary increases and positive formal reviews from supervisors.

In the middle of August, 2002, Mammone apparently experienced a manic episode. This episode led to workplace

legally be terminated, because he did not commit misconduct at all, and certainly not egregious misconduct.

[5]Mammone was initially hired by the President and Fellows of Harvard University (university) faculty of arts and sciences as a part-time employee in August of 1995. In January, 1996, however, he became a permanent employee and began his work as a staff assistant.

[6]The university's written job description for Mammone's position also required him to have "excellent . . . interpersonal [and] customer service . . . skills," to have a "professional appearance and presentation," and to be able to assist "with routine security and safety measures." Mammone called himself "the face of the museum" and explained that he was often the first or only employee a patron would see on entering the museum.

[7]Mammone also suffers from major recurrent depression.

[8]The university does not dispute that Mammone was handicapped at the time he was fired, that he continues to be handicapped, or that the university knew of his handicap when they finally terminated his employment.

misconduct that eventually resulted in his termination. On August 18, Mammone established a website to decry what he believed were the low wages the university pays some of its employees.[9] On August 20, while on duty at the museum, he began to distribute flyers summarizing and advertising his website. He also engaged coworkers in loud and animated conversations regarding his website and its content. He frequently used his personal laptop computer to access and update his website during his shift. According to his own testimony, Mammone would sing along with, clap to, and dance to protest songs from his website while stationed at the receptionist desk.[10] On August 22, Mammone's supervisor, Michele Piponidis, informed him, both orally and in writing, that he should not use his laptop computer at work. The next day Mammone sent an electronic mail message to Piponidis refusing to follow her instructions. He continued to bring his laptop computer to work, and to use it in the manner described above, until the date of his termination.

Mammone's manic episode appeared to reach its zenith between August 29 and September 4. On August 29, when he could not find the keys to his house, he began to believe that a conspiracy had formed against him. That night, Mammone stayed at a local YMCA. However, because he believed persons at the YMCA were also involved in the conspiracy, he telephoned the police the next morning. Although Mammone thereafter was brought to a hospital for overnight examination,[11] he did not meet the criteria for involuntary civil commitment

---

[9]Mammone essentially testified that his manic episode began before or by the middle of August, 2002. On the university's medical certification form, completion of which is required for short-term disability benefits, Mammone's psychiatrist dated the onset of Mammone's episode as August 15, 2002. Although the judge found that Mammone's manic episode did not begin until after his creation of the website, the evidence, examined in its light most favorable to Mammone, suggests that Mammone's manic episode began before his creation of the website and continued through his termination.

[10]Although Mammone rejects the label "dancing," his testimony makes clear that he did, in fact, dance to these songs in the museum lobby. Mammone would also invite his fellow coworkers to join him in viewing, discussing, and singing along with the songs on his website. He testified that he either sang, clapped, or danced to these songs on at least ten distinct occasions.

[11]On August 30, Mammone was sent to two hospitals. At the first, he was administered Ativan, a tranquilizing drug, several times. Mammone is allergic

and was thus released at his own insistence on August 31.[12] On September 3, subsequent to the Labor Day holiday, Mammone returned to work, his mania only worsening.[13] That day, a staff member of the museum's public programs office explained to Piponidis that Mammone's "belligerent attitude is not only affecting [the museum's] staff, but also visitors to the museum." That night, Mammone was contacted by his union representative, who left him with the impression that Piponidis was seeking to meet with Mammone and a representative of the university's office of labor and employee relations for the purpose of terminating his employment.

On the morning of September 4, 2002, Mammone arrived at work in brightly colored, traditional East Indian dress and adorned with necklaces, bracelets, and rings.[14] While at his desk, he telephoned the police, his mother, his sister, and an attorney with the American Civil Liberties Union (ACLU) and spoke to each person "very loudly." When Piponidis approached him and asked him to join her in a private conference room, Mammone refused. He dismissively flicked his hand at her, saying, "Psst, get away from me, you're evil." Piponidis left the lobby and returned with both Mary Reynolds, the museum's human resources administrator, and two university police officers. The officers informed Mammone that Piponidis and Reynolds wanted him to leave the museum and attend a meeting at the university's office of labor and employee relations the follow-

---

to Ativan and related drugs, and his allergic reaction exacerbated his manic episode.

[12]Mammone was directed to attend a follow-up appointment with one of the university's health services psychiatrists, Dr. Irving Allen, on September 3, 2003. It does not appear that he did so at that time.

[13]An associate curator at the museum wrote to Michele Piponidis on September 3 to "express concern" over Mammone's recent behavior. He explained that Mammone "seems to be experiencing psychological problems" and that "[e]ach day last week he seemed to grow more irrational." He also noted that since the holiday weekend Mammone "seems to have gone over the edge," and that he worried for "[Mammone's] health and sanity, public services at the [museum], and the safety and comfort of [museum] employees."

[14]Mammome had never worn outfits such as this to work before and concedes that this dress was inappropriate attire. He usually wore casual American-style clothes. Mammone testified that he wore the East Indian dress because he believed it had symbolic and protective powers.

ing day. When Mammone refused the officers' request, they explained that if he did not leave after five warnings, he would be arrested for trespassing. After the officers' second warning, Mammone left his desk and sat on the floor in the middle of the lobby. After another three warnings, the officers handcuffed Mammone and placed him under arrest. Because he refused to move, the officers were forced to drag Mammone from the museum. During his arrest, he was told by the police not to return "here."[15]

Mammone was charged with trespassing and disorderly conduct and arraigned in the Cambridge Division of the District Court Department.[16] Immediately after his arraignment, Mammone walked back to the museum area to assure his friend, who had witnessed the incident, that he was unharmed.[17] Mammone waited outside the museum for the end of his friend's shift. Then, before the end of the workday, Mammone entered the lobby of a second university museum, the Museum of Natural History, which was adjacent to and internally connected with the museum. Mammone did not believe that the arresting officer's admonition not to return "here" included any location other than the museum itself. Using a telephone in the lobby of the Museum of Natural History, Mammone telephoned the ACLU. During this conversation, Piponidis saw Mammone, approached him, and instructed him to leave the building. Mammone ended his telephone call, left the telephone booth, pointed at Piponidis (and Reynolds, who had joined Piponidis in the lobby close to the telephone booth), and stated, "You fucking whack bitches are going down."[18] Mammone then walked past the women and left the building. Reynolds followed Mammone

[15]After this incident, Piponidis wrote and mailed a letter to Mammone instructing him not to return to the museum, at least until his meeting with the office of labor and employee relations. The letter added that if Mammone did return to the museum, he would be treated as a trespasser.

[16]Mammone was ultimately found not guilty by reason of insanity on these charges.

[17]Mammone had not received Piponidis's letter instructing him to stay away from the museum, see note 15, *supra*, before returning to the museum area.

[18]Mammone contends that his statements to the women were meant as a "moral rebuke," as opposed to a threat, although he concedes that it could have been interpreted as the latter.

and hailed a nearby university police officer, who told Mammone to leave the university's campus.

On that same day, after Mammone's arrest, but before the confrontation in the Museum of Natural History, Piponidis had written and sent to Mammone a "final written warning," see note 15, *supra,* summarizing his problematic workplace misconduct and indicating that this misconduct had "become progressively more and more disruptive" and was "completely unacceptable." The next day, September 5, Piponidis sent a superseding letter to Mammone, informing him that his return to the museum after his arrest, his subsequent conduct toward Piponidis and Reynolds, and the conduct described in the previous letter was grounds for immediate discharge and that this discharge was "effective at the end of business . . . September 4, 2002."

At some point over the next few days, Mammone's union representative convinced officials at the university not to "process [Mammone's] termination immediately so that [he] could apply for short-term disability [benefits]."[19,20] Piponidis then wrote a third letter to Mammone which superseded the September 5 letter, confirming that the university would "delay the effective date of [his] termination . . . to allow [him] an opportunity to apply for Short-term Disability . . . benefits." The letter explained that Mammone's employment would terminate "effective the day the . . . benefits end."[21]

Mammone first applied for disability benefits on September

[19]To qualify for short-term disability benefits, one has to be a current employee. Mammone applied for benefits on September 9. On September 13, a university official certified that Mammone "is a current employee" of the university. On September 23, Mammone's application was granted.

[20]The union representative, however, failed to convince the university that it should not terminate Mammone after his benefits expired and allow him to return to work assuming he could medically do so.

[21]Mammone claims that he never received this letter, but admits to finding a copy of it in his personnel file when inspecting the file in preparation for the present case. In this file was also a handwritten note that Mammone claims shows that the university chose, at this point, not to fire him at all if he applied for disability benefits. As the Superior Court judge correctly noted, an examination of the context of this note, other documents relating to this note, and the entire sequence of events forces the conclusion that the handwritten note simply meant the university would not make his termination effective until after his short-term disability benefits expired. In any event, it is clear

9, 2002. Based on a September 12 examination, Dr. Irving Allen, a psychiatrist at the university's health services, informed the university's disability claims unit that Mammone could not work due to a bipolar disorder and recurrent depression, and that this incapacity would likely last between thirty and ninety days. Mammone's application was granted on September 23. On October 22, Dr. Allen recommended another sixty days of disability benefits, explaining that Mammone's "irritability . . . and agitation persist." On December 12, Dr. Allen requested that Mammone be given an additional sixty days of benefits, noting that, while Mammone was "making significant improvement," he was "not stable enough to return to work." A similar request was successfully made by Dr. Allen on January 30, 2003. In clinician notes dated February 14, 2003, Dr. Allen reported marked improvement, but added that Mammone was "feeling depressed" and that "[t]here are still tinges of mania . . . ." On March 5, 2003, Mammone's disability benefits expired. On March 7, 2003, his termination became effective. Although a jury could have found that Mammone was well enough to return to work on that date,[22] there was no evidence that Dr. Allen or anyone else ever informed the university that this was the case.

On December 9, 2002, approximately three months after Mammone began receiving short-term disability benefits, an attorney informed the university in writing that she had been retained to represent Mammone in a discrimination action against the university. Her letter noted that the university had offered Mammone "[n]o reasonable accommodation, such as time off in which to get better . . . ."

2. *Discussion.* a. *Standard of review.* A moving party will prevail on summary judgment, where the party opposing the

from Mammone's testimony and from a letter sent by his counsel to the university during the time in which Mammone was receiving disability benefits, that all parties understood Mammone to have actually been fired on September 4, with the effective date being postponed until his benefits ended.

[22]In his March 10, 2003, clinician notes, Dr. Allen described Mammone as "fairly stable now." Approximately one year later, on January 29, 2004, in a letter to Mammone's attorney, Dr. Allen referenced this date and explained that, "in [his] opinion, [Mammone] would have been able to resume work, while continuing treatment."

motion bears the burden of proof at trial, only if the moving party demonstrates, by reference to the material described in rule 56 (c), unmet by countervailing materials, that the nonmoving party has no reasonable expectation of proving an essential element of the case. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). It is sufficient that the moving party demonstrate that "proof of [a required] element is unlikely to be forthcoming at trial." *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 809 (1991).

b. *The* Garrity *decision.* In *Garrity*, a terminated United Airlines customer service representative, Mary Garrity, brought a discrimination claim against her former employer under G. L. c. 151B. We affirmed the grant of summary judgment in favor of the defendant airline because we concluded that Garrity could not reasonably expect to prove that she was a qualified handicapped person, as defined in G. L. c. 151B, § 1 (16). *Id.* at 63. Because establishing that she was "qualified for the position from which she was fired" is a requirement of a prima facie case under G. L. c. 151B, Garrity's inability to do so was fatal to her claim. See *id.* at 60, 63.

Garrity suffered from alcoholism. As part of her employment, she was asked to distribute "chits" to passengers, which could be exchanged for free drinks during flight. When some passengers declined the chits, Garrity, irresistibly compelled by her disease, kept them for herself. After her shift, she boarded a United Airlines flight, paying a significantly reduced employee fare. On the flight, Garrity exchanged the chits for free drinks, "became intoxicated and began drawing attention to herself and to the fact that she was a United Airlines employee." *Id.* at 57. Garrity "demanded excessive service and attention" and complained to and in front of passengers "about how United 'screws us.'" *Id.* United Airlines terminated Garrity for "violating company policies by accepting 'drink chits' from customers, using those chits while flying on a United pass . . . and for becoming intoxicated" while on the flight. *Id.* at 59.

In affirming summary judgment, we reasoned that a disabled individual cannot be a qualified handicapped person "if he commits misconduct which would disqualify an individual who did not fall under the protection of the statute" (i.e., a non-

handicapped employee). See *id.* at 62-63, quoting *Wilber* v. *Brady*, 780 F. Supp. 837, 840 (D.D.C. 1992). We noted that "[n]othing in c. 151B suggests a legislative intent that a lower standard of qualifying conduct should apply to handicapped employees than applies to those without handicap." *Garrity, supra* at 63. *Garrity* confirmed the commonsense notion that an employee is not "qualified" for a particular job — i.e., cannot perform the essential functions of that job, even with reasonable accommodation — if he or she takes part in "egregious misconduct" in the workplace. See *id.* at 62-63, quoting *Little* v. *Federal Bur. of Investigation*, 1 F.3d 255, 258-259 (4th Cir. 1993) (" '[A]n employer . . . must be permitted to terminate its employee on account of egregious misconduct, irrespective of whether the employee is handicapped.' . . . [A] handicapped employee who engages in conduct significantly inimical to the interests of his employer and in violation of the employer's rules . . . is not a 'qualified handicapped person' within the meaning of G. L. c. 151B").

c. *Applicability of* Garrity *to the present case.* Mammone's workplace misconduct, which took place over the course of two weeks, was at least as egregious and inimical to his employer's interest as was the misconduct for which Garrity was terminated. Mammone intentionally disregarded his supervisor's instructions regarding the use of his personal computer during work. Instead of acting as the professional face of the museum to visitors, he created numerous unprofessional disturbances for the public to witness at the exact location where they would decide whether to purchase admission to the museum. He exhorted his coworkers to do the same. During his shift, Mammone distributed flyers summarizing and advertising a website critical of the university and his supervisors. Certainly this misconduct was as inimical to his employer's interests as were Garrity's complaints to customers and employees about United Airlines, her demands for excessive service and attention from flight attendants, and her drawing of attention to herself as an unprofessional United Airlines employee.

Mammone's misconduct on September 4, however, was by far the most egregious of his actions. First, he abusively dismissed his supervisor's request to meet with her to discuss his behavior. Then he refused a request made by his supervisor

and the museum human resources administrator to leave the museum and attend a meeting at the university's office of labor and employee relations the next day. Finally, he refused five lawful police orders to leave the premises, chose to become a trespasser, and forced the police to create a spectacle by physically carrying him out of the museum.[23] Later that day, on his return to the museum area, Mammone used objectively abusive, threatening, and sexually derogatory language to his supervisor and the human resources administrator, violating all reasonable standards expected at a place of business and public accommodation. Cf. *Hamilton* v. *Southwestern Bell Tel. Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998) (Americans with Disabilities Act [ADA] does not protect employee's "emotional or violent outbursts," such as "get that f__ing finger out of my face" or "[y]ou f__ing bitch!," even if such misconduct attributable to employee's posttraumatic stress disorder); *Maes* v. *Henderson*, 33 F. Supp. 2d 1281, 1283, 1286, 1289 (D. Nev. 1999) (where "Postal Service demoted Plaintiff based on his off-color joking, sexual comments, threats, and hostile treatment of . . . employees, not on the basis of his depression," no claim under Rehabilitation Act). This conduct went far beyond anything Garrity said or did to her coworkers or United Airline customers. The judge below thus correctly concluded that the application of the *Garrity* decision to the facts of the instant case could only result in summary judgment for the university.

In his dissent, Justice Greaney argues that our comparison of the conduct of Mammone and Garrity is "subjective conjecture and inappropriate for summary judgment purposes." *Post* at 681-682. We disagree. As noted, *Garrity* involved a decision at the summary judgment stage. In that case, we explained that the "material before the [Superior Court] judge clearly demonstrated Garrity's conduct to be such that Garrity could not reasonably expect to prove that she was a 'qualified handicapped person' entitled to c. 151B's protection." *Garrity, supra* at 63. We did not balance this conduct against any positive work history Garrity may have had, and we did not consider whether Garrity

---

[23]Mammone's later return to the vicinity of the earlier incident violated the spirit if not the letter of the order he was given by an arresting officer not to return "here."

could have (in the future) performed satisfactorily with a reasonable accommodation. We simply concluded that Garrity's conduct exceeded the egregious misconduct threshold. Similarly, we agree with the Superior Court judge in the present case that the materials before him on summary judgment evidenced conduct even more egregious than that of Garrity.[24] The practice of comparing and contrasting the facts of a case (as found in a lower court) to the facts of previously decided cases, particularly those in a similar procedural posture, is not new or controversial.

The dissent further faults our analysis for not considering whether Mammone could have performed his job successfully in the future if given a reasonable accommodation. According to the dissent, the definition of a "qualified handicapped person" in G. L. c. 151B includes an employee who has engaged in egregious misconduct, but who could, in the future, perform his job without such misconduct if provided a reasonable accommodation.[25] Certainly, the court did not engage in such an

---

[24]We assume that had Mammone, for example, physically assaulted and harmed a museum patron, the dissent would not consider our comparison "subjective conjecture . . . inappropriate for summary judgment purposes." *Post* at 681-682. That the relevant comparison is not as extreme does not render it inappropriate as an analytic tool.

[25]To the extent that the dissent may, alternatively, be suggesting that had the university on its own initiative forced a "reasonable accommodation" on Mammone prior to these incidents, Mammone would not have committed egregious workplace misconduct, the argument suffers from two flaws. First, although the dissent asserts that Piponidis "had been aware for some time that the plaintiff struggled with mental health issues," *post* at 683, the record simply does not reflect this. At most, Piponidis knew that Mammone was suffering from some unspecified mental problems shortly after the onset of the events in question. Second, despite the dissent's suggestion that employers should be required to raise affirmatively the issue of a reasonable accommodation with a handicapped employee who does not request such accommodation, *post* at 685-687, our case law does not support this position. See *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 454, 457 (2002), quoting *Taylor* v. *Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.), cert. denied, 519 U.S. 1029 (1996) ("it is an employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one"); *Andover Hous. Auth.* v. *Shkolnik*, 443 Mass. 300, 308 (2005) (same); *Sullivan* v. *Raytheon Co.*, 262 F.3d 41, 47-48 (1st Cir. 2001), quoting *Soto-Ocasio* v. *Federal Express Corp.*, 150 F.3d 14, 19 (1st Cir. 1998) ("ADA's [American with Disabilities Act's] interpretive regulation 'may require an employer "to initiate an informal, interactive process" with the individual seeking the accommodation.' . . . However,

analysis in *Garrity*.[26] Rather, we concluded that egregious workplace misconduct disqualified an employee from protection of the statute without regard to whether that employee could at some future date conform her behavior to acceptable standards. The statutory definition does not require otherwise. An employee who has committed egregious workplace misconduct (conduct so inimical to an employer's interest that any employee would be fired for the same acts) has precluded himself from "performing the essential functions of the position," with or without a reasonable accommodation.

Mammone's attempts to distinguish his case from *Garrity* are unpersuasive. Principally, Mammone contends that *Garrity* should be limited to cases involving workplace misconduct caused by alcoholism or other substance dependency disorders.[27] He argues that workplace misconduct caused by any other handicap should bar an employee from being considered a "qualified handicapped person" as a matter of law only if the misconduct "poses a direct threat to himself or others (shown

there is no such requirement under Massachusetts law . . .").

[26]The cases cited by the dissent for its proposition are inapposite. *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813 (1997), involved a well-behaved employee whom the employer suggested was not qualified because he could not perform certain job-specific functions. *Tate* v. *Department of Mental Health*, 419 Mass. 356, 365 (1995), affirmed summary judgment for an employer who fired a deaf employee for insubordination, and did not involve disability-related misconduct.

[27]Mammone also suggests that *Garrity* might be confined to employees whose jobs include law enforcement or safety responsibilities. It is, however, unclear how Garrity's job as a customer service representative included special safety responsibilities. Moreover, if Garrity can be considered to have had certain safety responsibilities, Mammone had similar safety responsibilities, as evidenced by the university's official job description for his position. For its part, although the dissent "agree[s] . . . that the *Garrity* decision cannot fairly be limited to circumstances involving alcoholism or other addictions," it accuses us of "overlook[ing] distinctive circumstances" that "remove [the present case] from the scope of the *Garrity* holding." *Post* at 682. Yet, aside from the fact that this case involves a person suffering from bipolar disorder while *Garrity* involved a person suffering from alcoholism, the dissent never makes clear what "distinctive circumstances" are present in this case that were not present in *Garrity*. For example, although the dissent makes much of Mammone's positive work history and his general ability to fulfil the specific duties of the job, it does not so much as mention whether a similar fact was present or absent from the *Garrity* case.

by a reasonable probability of substantial harm)," Massachusetts Commission Against Discrimination Guidelines: Employment Discrimination on the Basis of Handicap Chapter 151B § X.D (1998) (MCAD Guidelines).[28] He further argues that he has a reasonable chance of proving that his misconduct did not rise to this level.[29]

*Garrity* relied heavily on two Federal cases, *Little* v. *Federal Bur. of Investigation,* 1 F.3d 255 (4th Cir. 1993) (*Little*), and *Wilber* v. *Brady,* 780 F. Supp. 837, 840 (D.D.C. 1992) (*Wilber*), which interpreted the Federal Rehabilitation Act.[30] See *Garrity, supra* at 59, 61-63 ("In construing and applying . . . G. L. c. 151B, we are helped by case law construing the analogous Federal statute, § 504 of the Rehabilitation Act of 1973"). Mammone correctly notes that both of these cases centered on workplace misconduct resulting from an employee's alcoholism and, more specifically, an employee's inebriation. See *Little, supra* at 257-258 (agent fired for on-duty intoxication); *Wilber, supra* at 840 (investigator with Bureau of Alcohol, Tobacco and Firearms caused fatal motor vehicle accident while driving under influence of alcohol). Because *Garrity, supra* at 63, which also dealt with an employee suffering from alcohol-

---

[28]Because we conclude that all handicaps should be treated the same in this regard, we need not determine whether Mammone's misconduct, specifically his profane, vulgar, and threatening statement to his supervisors, would constitute a direct threat to the safety of others.

[29]Mammone also contends that he has a reasonable chance of proving that his misconduct did not rise to the level of egregious misconduct under the *Garrity* standard. See *id.* at 60. As discussed above, however, the evidence viewed in its most favorable light plainly supports the conclusion that Mammone's conduct was egregious and sufficiently inimical to his employer's interest to warrant the termination of a nonhandicapped employee.

[30]The Federal Rehabilitation Act protects, inter alia, handicapped employees of federal agencies from discriminatory employment action. "The ADA defines disability in essentially the same terms as the Rehabilitation Act. . . . The ADA enlarges the scope of the Rehabilitation Act to cover private employers, but the legislative history of the ADA indicates that Congress intended judicial interpretation of the Rehabilitation Act to be incorporated by reference when interpreting the ADA." (Citations omitted.) *Nielsen* v. *Moroni Feed Co.,* 162 F.3d 604, 608 n.7 (10th Cir. 1998). Thus, we cite variously to interpretations of provisions of both of these acts that are analogous to G. L. c. 151B, particularly the portion of the acts requiring an employee to be otherwise qualified for a position in order to be eligible for statutory protection.

ism, held that the "reasoning with respect to the Rehabilitation Act in *Little . . .* and [*Wilber*] *. . .* applies with equal force to the interpretation and application of G. L. c. 151B *in the circumstances of the present case*" (emphasis added), Mammone suggests that we only adopted the principles announced in *Little* and *Wilber* for cases concerning misconduct stemming from alcoholism or substance dependency disorders.

Our decision in *Garrity*, however, did not expressly or impliedly distinguish between persons who were handicapped by alcoholism and persons who were handicapped by some other disorder. Rather, the court continuously used broad and generic language. See *id.* at 62-63 ("handicapped employee"; "handicapped employees"; "disabled individual"; and "individuals with disabilities"). The court's explanation in *Garrity*, that *Little, supra,* and *Wilber, supra,* were persuasive "in the circumstances of the present case" referenced the degree of egregiousness of the misconduct for which Garrity was fired, not the type of underlying disorder that caused her conduct.

Moreover, the Federal cases relied on in *Garrity* use similarly expansive language. See, e.g., *Wilber, supra* at 840 (Federal statute "mandates nondiscrimination against *disabled* individuals; it does not waive basic prerequisites to service. . . . The law of this Circuit [and . . . the other courts that have ruled on the issue] is clear that *those* who commit serious misconduct" are not protected by the statute [emphasis added]). In particular, the cases speak of the purposes and coverage of the entire Federal statutory scheme, not just those portions that address alcoholism. See *Little, supra* at 258 (employer subject to "Rehabilitation Act must be permitted to terminate its employee on account of egregious misconduct, irrespective of whether the employee is handicapped"); *Wilber, supra* ("The Rehabilitation Act is designed to put individuals with disabilities on equal footing with non-disabled people in regards to the hiring, promotion, and discharge decisions . . . . It is not designed to insulate them from disciplinary actions which would be taken against any employee regardless of his status. . . . [T]he Act is designed to help rehabilitate those who have not already

disqualified themselves through their own misconduct").[31]

Our holding that an employer does not violate G. L. c. 151B by terminating an employee for egregious misconduct stemming from *any* recognized handicap (as opposed to termination for the handicap itself) is consistent with the view adopted by the majority of courts that have faced the issue in interpreting Federal discrimination laws. See Timmons, Accommodating Misconduct Under the Americans with Disabilities Act, 57 Fla. L. Rev. 187, 211-215 (2005). See also *Maes* v. *Henderson*, 33 F. Supp. 2d 1281, 1288-1289 (D. Nev. 1999) ("Most circuit courts which have considered the question have reached the same conclusion; that is, if a disabled employee engages in misconduct, an employer may terminate . . . that employee without incurring liability under the Rehabilitation Act or the Americans with Disabilities Act"). This is the case despite the fact that, in the Rehabilitation Act, "Congress only *expressly* permitted employers to hold . . . *alcoholics* to the same . . . standards of conduct as other employees even though their disability causes misconduct" (emphasis in original). *Nielsen* v. *Moroni Feed Co.*, 162 F.3d 604, 609 (10th Cir. 1998), quoting *Den Hartog* v *Wasatch Academy*, 129 F.3d 1076, 1086 (10th Cir. 1997). Particularly in the absence of any similar distinction made in G. L. c. 151B's statutory text or in our case law, we decline Mammone's invitation to adopt the minority view that "the status-conduct dichotomy exists only in the contexts of alcoholism and illegal drug use" and that "[o]utside of those contexts . . . the [relevant discrimination statute] protects both the disability and the conduct caused by the disability." *Nielsen* v. *Moroni Feed Co.*, supra at 609.[32]

That *Garrity* was meant to apply to all disability-related

---

[31]Mammone's contention that *Little* v. *Federal Bur. of Investigation*, 1 F.3d 255 (4th Cir. 1993) (*Little*), and thus *Garrity*, were meant to apply only to alcohol-related misconduct is undermined by subsequent case law from the same jurisdiction where the *Little* case was decided. See *Jones* v. *American Postal Workers Union, Nat'l*, 192 F.3d 417, 429 (4th Cir. 1999) (where employee suffering from schizophrenia and posttraumatic stress syndrome, "law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability").

[32]We do not imply that disability-related misconduct is entitled to no protection from relevant discrimination statutes. To the extent that such misconduct

misconduct, not just alcoholism-related misconduct, is not surprising.[33] "Alcoholism is a handicap," MCAD Guidelines, *supra* at § X.C.2, and alcoholism cases are analyzed in the same way as other handicap discrimination cases. See Sullivan, Balancing the Rights of the Alcoholic Employee with the Legitimate Concerns of the Employer: Reasonable Accommodation vs. Undue Hardship, 46 Mont. L. Rev. 401 (1985).[34] Just as

---

is not egregious and sufficiently inimical to the employer's interest, it is entitled to protection. The position we adopt would not "permit employers carte blanche to terminate employees with mental disabilities on the basis of any abnormal behavior" and thus "largely nullify the . . . protection of the mentally disabled." *Den Hartog* v. *Wasatch Academy,* 129 F.3d 1076, 1087, 1089-1092 (10th Cir. 1997) (affirming summary judgment in favor of boarding school that terminated live-in teacher because mentally ill son posed direct threat to others on campus).

[33]In *Andover Hous. Auth.* v. *Shkolnik,* 443 Mass. 300, 310 (2005), this court implied that *Garrity* is not confined to cases of alcoholism or substance dependency. In that case, we affirmed the dismissal of a housing discrimination counterclaim brought under G. L. c. 151B by elder residents of a public housing unit who were being evicted for various violations of the housing authority's rules and policies. None of these violations was a direct threat to the safety of the elder resident or other residents of the public housing complex. Assuming arguendo that one of the residents was handicapped — suffering from Alzheimer's dementia, depression, and a host of other mental and physical ailments — and that the housing violations stemmed from this handicap, the court turned to whether the resident met the definition of a qualified handicapped person. Citing *Garrity* for the proposition that an employee is not a qualified employee "if he engages in conduct 'significantly inimical to the interests of his employer and in violation of his employer's rules,' " *Andover Hous. Auth.* v *Shkolnik, supra,* we reasoned that, "[i]n the public housing context, a 'qualified' handicapped individual is one who could meet the authority's eligibility requirements for occupancy and who could meet the conditions of a tenancy, with a reasonable accommodation . . . ." *Id.* We rejected the residents' claim because they made no showing that "they could comply with the terms of their lease by not disturbing their neighbors." *Id.* at 311. Neither *Shkolnik, supra,* nor its interpretation of *Garrity* suggests that *Garrity* is confined to disability-related misconduct caused by alcoholism. To the contrary, *Shkolnik* considers the principles announced in *Garrity* to apply to a situation involving misconduct that does not constitute a direct threat, caused by mental disease.

[34]Case law and statutes from around the country consistently affirm that alcoholism constitutes a handicap. See, e.g., *Garrity, supra* at 61, quoting *Little, supra* at 258 ("It is settled that alcoholism is a handicapping condition within the meaning of the Rehabilitation Act"); *White* v. *Lee,* 227 F.3d 1214, 1229 n.11 (9th Cir. 2000) ("A person is considered handicapped under the [Fair Housing Amendments] if he has a physical or mental impairment [including 'mental retardation, emotional illness, drug addiction (other than

"[n]othing in c. 151B suggests a legislative intent that a lower standard of qualifying conduct should apply to handicapped employees than applies to those without handicap," *Garrity, supra* at 63, nothing in G. L. c. 151B suggests a legislative intent that persons suffering from alcoholism are in any way less handicapped than persons suffering from other disorders. Correspondingly, the standard we used in *Garrity* to determine whether an employee's alcoholism-related misconduct excludes that employee from the definition of "qualified handicapped person" should be used to examine all disability-related misconduct. By its express terms, the definition of "qualified handicapped person[s]" in G. L. c. 151B, § 1 (16), applies to all "handicapped person[s]." We perceive no basis on which to construe *Garrity* or the statutory definition of "qualified handicapped person" in a way that would create significantly different levels of disqualifying disability-related misconduct based on whether the misconduct stems from alcoholism or some other disability.

Mammone's assertion that G. L. c. 151B creates a two-tiered system of disability-related workplace misconduct is not based on statutory text. Rather, Mammone points to interpretive MCAD Guidelines. See MCAD Guidelines, *supra* at § I ("These guidelines are intended to assist employers, labor organizations, employment agencies and persons with handicaps, and their lawyers, in understanding what employment practices are lawful or unlawful and what steps must be taken to accommodate handicapped persons"). See also *Cargill* v. *Harvard Univ.*, 60 Mass. App. Ct. 585, 594 (2004), quoting *Dahill* v. *Police Dep't of Boston*, 434 Mass. 233, 239 (2001) ("With respect to the MCAD guidelines as an informing source, the court has observed that, '[g]uidance provided by the [MCAD] . . . is also illuminating. . . . The guidelines represent the MCAD's interpretation of G. L. c. 151B, and are entitled to substantial deference, even though they do not carry the force of law' "). In Mammone's view, the MCAD Guidelines recognize a stark distinction between alcoholism-related mis-

addiction caused by current, illegal use of a controlled substance) and alcoholism]"); *Hazlett* v. *Martin Chevrolet, Inc.*, 25 Ohio St. 3d 279, 279-280 (1986) ("alcoholism [is a] handicap[]" as defined by Ohio's civil rights statute).

conduct and misconduct stemming from all other disabilities.

The MCAD Guidelines include a section entitled "Special Topics." *Id.* at § X. A portion of this section addresses "Substance Abuse," including addiction to drugs and alcohol. *Id.* at § X.C.2, 3. After explaining that "[a]lcoholism is a handicap" and that the definition of "qualified handicapped person" "applies to individuals who are handicapped as a result of their addiction to alcohol," the MCAD Guidelines, *supra* at § X.C.3, state:

> "An employer may hold individuals who are handicapped as a result of their [alcoholism] to the same standards of job conduct and performance as other employees, subject to the duty to reasonably accommodate the employee. The employee may be terminated to the extent that the employee cannot perform the essential functions of his/her job, with or without reasonable accommodation.
>
> "An addicted individual engaging in misconduct may be subjected to . . . termination if the employer would subject a non-handicapped individual to similar discipline for similar misconduct. This is true even if the misconduct is related to the handicap. On the other hand, an employer may not treat the misconduct of an addicted employee more harshly than it would the misconduct of a non-handicapped individual. Moreover, where misconduct is related to the handicap, the employer may have a duty to provide reasonable accommodation."

A second subdivision deals with "Disability-Related Misconduct." MCAD Guidelines, *supra* at § X.D. This subdivision does not address whether an employer can terminate an employee for disability-related misconduct for which a non-handicapped employee would be terminated. Nor does it explicitly say that handicapped individuals may be held to the same standard of job conduct as other employees. Rather, the MCAD Guidelines explain that "[w]here misconduct is related to a handicap or disability, there may be a duty to provide reasonable accommodation[,] . . . for example, a leave of absence . . . ." *Id.* The MCAD Guidelines then note that

"[w]here the employee's behavior poses a direct threat to himself or others . . . the employee may not be considered a 'qualified handicapped person.' " Finally, "[i]n determining whether reasonable accommodation is possible, the employer should make an objective evaluation of all available relevant facts about the employee's work history and medical history." *Id.*

The MCAD Guidelines appear to be modeled after Federal regulations and guidelines interpreting the ADA and the Federal Rehabilitation Act. See MCAD *Guidelines, supra* at § I n.2 ("the Federal guidelines can be used to guide Massachusetts in interpreting G. L. c. 151B"); *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 823 n.13 (1997).[35] There is no question that Federal regulations, guidelines, and other interpretive sources treat alcoholism and alcohol-related misconduct uniquely for purposes of Federal discrimination law.[36] However, as noted above, the Federal statutes that these regulations and guidelines interpret explicitly distinguish alcoholism and alcoholism-related conduct from other disabilities and disability-related conduct. See *Nielsen* v. *Moroni Feed Co.*, 162 F.3d, 604, 609 (10th Cir. 1998) ("The ADA states that a covered entity 'may hold an

[35]The MCAD Guidelines explain that "[s]ources of guidance under analogous federal law include . . . [the Federal Rehabilitation Act and the ADA], U.S. Equal Employment Opportunity Commission Regulations: Equal Employment Opportunity for Individuals With Disabilities, 29 C.F.R. § 1630 (1997); EEOC Interpretive Guidance on Title I (Equal Employment Provisions) of the Americans with Disabilities Act, 29 C.F.R. app. § 1630; U.S. Equal Employment Opportunity Commission, Technical Assistance Manual on ADA Title I . . . EEOC Enforcement Guidance On the Americans With Disabilities Act and Psychiatric Disabilities, EEOC Notice Number 915.002, 3-25-97." MCAD Guidelines, *supra* at § I n.2.

[36]Compare *Den Hartog* v. *Wasatch Academy*, 129 F.3d 1076, 1086 (10th Cir. 1997) (EEOC Enforcement Guidance: Psychiatric Disabilities and the Americans With Disabilities Act, 2 EEOC Compl. Man. [BNA] at 28 par. 30 [Mar. 25, 1997], provides that employer must make reasonable exception to workplace rules regarding neatness and courteousness to mentally disabled employee whose disability prevented compliance, but who did not interact with customers), with 43 U.S. Op. Att'y Gen. 75, 76 (1977) (Federal Rehabilitation Act does not "prevent the application to persons suffering from alcoholism . . . of reasonable rules of conduct"), and *Little* v. *Federal Bur. of Investigation*, 1 F.3d 255, 258 (4th Cir. 1993) (42 Fed. Reg. 22,686 [1977] provides that employer "may hold . . . alcoholic to the same standard of . . . behavior to which it holds others, even if . . . behavior is related to . . . alcoholism").

employee who . . . is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the . . . alcoholism of such employee . . . .' 42 U.S.C. § 12114[c][4]. The Rehabilitation Act similarly removes unsatisfactory conduct caused by alcoholism from its purview . . ."). There is thus significant justification for the position that "because Congress only expressly permitted employers to hold . . . alcoholics to the same objective standards of conduct as other employees even though their disability causes misconduct . . . Congress implicitly did not intend to extend the same employer prerogative to employees with *other* disabilities" (emphasis added) (citation omitted). *Den Hartog* v. *Wasatch Academy*, 129 F.3d 1076, 1086 (10th Cir. 1997). The regulatory interpretations of the Federal statutes are thus reasonable given their statutory text.

To the extent that the MCAD's Guidelines may be read to afford different degrees of protection to disability-related workplace misconduct depending on whether the underlying disability is that of alcoholism or some other disorder,[37] such a reading would be inconsistent with our statute. Cf. *Massachusetts Eye & Ear Infirmary* v. *Commissioner of the Div. of Med. Assistance*, 428 Mass. 805, 813 (1999) (regulations not

---

[37]The MCAD Guidelines need not be read in this fashion. In dealing with alcoholism, they explain that even though an employer can terminate an employee for alcoholism-related misconduct if a nonhandicapped employee would be terminated for similar conduct, "where misconduct is related to the handicap, the employer may have a duty to provide reasonable accommodation." MCAD Guidelines, *supra* at § X.C.3. They then include a cross-reference to the section governing disability-related conduct. *Id.* A reasonable reading of the MCAD Guidelines is that employers may be required to make reasonable accommodation for disability-related misconduct regardless of the type of disability an employee suffers. However, the MCAD Guidelines do not further elaborate when the employer must make such an accommodation. At most, they advise that an employer definitely does not have to make such an accommodation when the employee is a direct threat to the safety of himself or others. This is not inconsistent with *Garrity, supra* at 62, 63, which simply adds an additional circumstance where an employer is not required to make reasonable accommodations in the face of workplace misconduct, i.e., when such misconduct is "egregious" and sufficiently "inimical" to the employer's interest, to warrant the termination of a nonhandicapped employee.

followed if contrary to law). General Laws c. 151B neither contains nor suggests such a distinction. Indeed, where the Federal statutes explicitly treat alcoholism, drug addiction, and current use of alcohol or illegal drugs differently from other handicaps, G. L. c. 151B explicitly singles out only current illicit drug use for unique treatment. See G. L. c. 151B, § 1 (17) ("term 'handicap' . . . shall not include current, illegal use of a controlled substance").[38] There is therefore no basis to import into our statute a Federal statutory distinction — one that our Legislature did not choose to adopt — only because Federal guidelines can often be used to aid interpretation of G. L. c. 151B. If the Legislature had intended to adopt the other distinctions provided for in Federal law, it had the means to do so. The Federal interpretive aids are therefore inapplicable on this point. Cf. *New Bedford* v. *Massachusetts Comm'n Against Discrimination*, 440 Mass. 450, 463 n.26 (2003) (to aid in interpretation of G. L. c. 151B, courts "consider Federal case law construing the cognate Federal unlawful discrimination statute, *unless we discern some reason to depart from those rulings*" [emphasis added]). See *Cargill* v. *Harvard Univ.*, 60 Mass. App. Ct. 585, 595 (2004), quoting *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 823 n.13 (1997) (courts can similarly use "[t]he Federal guidelines . . . to guide Massachusetts in interpreting G. L. c. 151B").

3. *Conclusion.* We hold that the reasoning of the *Garrity* decision is applicable to employment discrimination based on disability-related workplace misconduct regardless of the type of handicap underlying the misconduct. Thus, a handicapped employee who engages in egregious misconduct, sufficiently inimical to the interests of his employer that it would result in the termination of a nonhandicapped employee, is not a qualified handicapped person within the meaning of G. L. c. 151B,

---

[38]General Laws c. 151B, § 1 (17), provides that the term "handicap" "shall not include current, illegal use of a controlled substance." The MCAD Guidelines reasonably interpret this provision to mean that a person currently using illegal substances falls outside the definition of a handicapped person, even if such use is a result of a substance dependency addiction that would otherwise be considered a handicap. See MCAD Guidelines, *supra* at § X.C.1. Our decisions in *Garrity* and the present case are not inconsistent with this rule.

and therefore is not entitled to the protection of that statute.[39] While it is appropriate for a jury to decide the nature and extent of an employee's misconduct, where those issues are in dispute, the judge correctly concluded that Mammone had no reasonable expectation of proving that he was a qualified handicapped person on the facts of this case viewed in their light most favorable to him. We therefore affirm the grant of summary judgment for the university.[40]

*So ordered.*

GREANEY, J. (dissenting). This case illustrates precisely why

[39]The judge set forth a two-pronged test for determining whether an employee's misconduct is egregious enough to disqualify the employee from being considered a "qualfiied handicapped person." First, the judge looked to whether the employer terminated the employee promptly after the misconduct (which would demonstrate the employer's subjective belief that any person — handicapped or not — who engaged in such misconduct would be terminated). Second, the judge determined whether "[t]he misconduct is so egregious that no employer should reasonably be required to retain such an employee . . . even if the employee, with . . . reasonable accommodation, otherwise could perform the essential functions of the job." Although we do not replace the test espoused in *Garrity* with either prong of this test, it is obvious that these considerations are relevant, and often might be conclusive, on the question whether a triable issue exists concerning the plaintiff's status as a qualified handicapped person.

[40]Mammone also claims that the judge abused his discretion by limiting Mammone's discovery. Mammone requested that the university identify all employees of the entire university who had in the last ten years engaged in alleged insubordination or threatening words or actions toward university personnel together with information regarding the disciplinary action taken against them. The judge allowed Mammone's request as applied to information regarding employees of the museum (the unit of the university from which he was terminated) who engaged in such misconduct on or after January 1, 1994. For each identified employee, the university was required to turn over the employee's disciplinary record. Although discovery of how other employees were treated for similar misconduct might be relevant, for instance to show that such misconduct was not egregious or sufficiently inimical to the university's interest, it requires no extended discussion to conclude that the judge's order was a valid exercise of his considerable discretion in this area. Limiting the discovery to the unit from which Mammone was terminated fairly balanced his right to discover how similarly situated employees were treated with the university's right to be free from overburdensome discovery not likely to lead to any relevant or material information, and with concerns regarding the significant privacy interests of other university employees.

summary judgment is disfavored in employment discrimination cases. See *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, 427 Mass. 1, 16 (1998); *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 820 (1997). A reasonable jury, presented with the plaintiff's deposition testimony and other evidence in the summary judgment record, could conclude that the conduct for which the plaintiff was terminated was not "egregious misconduct," but rather a manifestation of his bipolar disorder, an illness over which he had no control and which was aggravated by confrontational treatment by a supervisor (Piponidis) who should have known better. The plaintiff was entitled to present his claim of discrimination to a jury. The court today holds otherwise and, in so doing, excludes from the scope of G. L. c. 151B protection an entire category of persons with mental illnesses, including bipolar disorder, whose symptoms include occasional displays of inappropriate, and sometimes bizarre, workplace behavior. See Diagnostic and Statistical Manual of Mental Disorders 357-361 (4th ed. 2000). There is no indication that the Legislature intended such a harsh interpretation of G. L. c. 151B. I therefore dissent.[1]

Comparing the behavior of the plaintiff in this case to that of the plaintiff in *Garrity* v. *United Airlines, Inc.*, 421 Mass. 55 (1995), the court determines that the plaintiff's conduct "went far beyond anything Garrity said or did," *ante* at 668, and thus concludes that the plaintiff in this case had no reasonable expectation of demonstrating he was a "qualified employee," *ante* at 680, for purposes of his G. L. c. 151B claim. This conclusion is subjective conjecture and inappropriate for summary judgment

---

[1] I agree that summary judgment was proper on the plaintiff's claim of discrimination under our equal rights statute, G. L. c. 93, § 103, not for the reason set forth by the court, but because this court consistently has treated G. L. c. 151B as the exclusive remedy for claims of handicap discrimination arising out of employment against an employer with six or more employees. See, e.g., *Tate* v. *Department of Mental Health*, 419 Mass. 356, 365 (1995); *Agin* v. *Federal White Cement, Inc.*, 417 Mass. 669, 672 (1994); *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 585 (1994); *O'Connell* v. *Chasdi*, 400 Mass. 686, 693 n.9 (1987). See also *Guzman* v. *Lowinger*, 422 Mass. 570, 571 (1996). For Federal cases addressing the same issue, see *Woods* v. *Friction Materials, Inc.*, 30 F.3d 255, 264 (1st Cir. 1994), citing *Martin* v. *Envelope Div. of Westvaco Corp.*, 850 F. Supp. 83, 93 (D. Mass. 1994), and *DeFazio* v. *Delta Air Lines, Inc.*, 849 F. Supp. 98, 103 (D. Mass. 1994).

purposes. The *Garrity* court set forth a general standard to bar a terminated employee from demonstrating that he or she is a "qualified" individual, regardless of a handicap, when the conduct on which termination was based is "significantly inimical to the interests of his employer and in violation of the employer's rules." *Id.* at 63, citing *Little* v. *Federal Bur. of Investigation*, 1 F.3d 255 (4th Cir. 1993). I agree with the court that the *Garrity* decision cannot fairly be limited to circumstances involving alcoholism or other addictions. See *Andover Hous. Auth.* v. *Shkolnik*, 443 Mass. 300, 309 (2005). I would, however, point out cautionary language in the *Garrity* opinion signifying that not every act of misconduct is sufficient to trigger this bar (it must be "egregious misconduct") and expressly limiting the court's reasoning to "the circumstances of the present case." *Garrity* v. *United Airlines, Inc., supra* at 62, 63. The court, in its rush to judgment, overlooks distinctive circumstances of the present case that should remove it from the scope of the *Garrity* holding.[2] In my view, whether the plaintiff's behavior in this case was "significantly inimical to the interests of his employer and in violation of the employer's rules" to rise to the level of "egregious misconduct" is a clear jury question.

To the court's recitation of the events leading to the plaintiff's termination, I add the following additional facts established by the summary judgment record viewed in the light most favorable to the plaintiff. See *Coveney* v. *President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 17 (1983). Although he was diagnosed with bipolar disorder in 1987, the plaintiff experienced symptoms of his disease only on rare occasions. During those occasions, the plaintiff would become paranoid, agitated, hyperactive, and irrational. Until the events that led to his termination, however, the plaintiff's condition never affected

---

[2]The plaintiff in *Garrity* v. *United Airlines, Inc.*, 421 Mass. 55 (1995), was an airline customer service representative terminated for the unauthorized taking of airline coupons for free drinks; using the coupons to obtain drinks while traveling on vacation; becoming drunk during the flight; and making loud, inappropriate comments to other passengers during the flight, such as "what a pain [frequent flyers] are" and that United "screws us." *Id.* at 57. This conduct was the subject of a disciplinary hearing, at which Garrity was represented by counsel, and in the end, her failure to comply with company policies specifically set forth in United's employee handbook led to her termination. *Id.* at 58-59.

his work at Harvard. From approximately mid-August, 2002, the plaintiff had been experiencing symptoms of a manic episode and was briefly hospitalized over the Labor Day weekend. Because hospital physicians administered the plaintiff medication to which he was allergic, hospitalization only served to exacerbate the plaintiff's manic state. On his return to work on September 2, it was obvious that the plaintiff was exhibiting uncharacteristically abnormal behavior, as shown by electronic mail messages received by Piponidis from museum staff expressing concern for the plaintiff and his mental health. One stated that the plaintiff's "emotions seem to be out of control." Another observed that the plaintiff appeared to be experiencing psychological problems and suggested the need for a medical intervention.

Instead of following that advice, Piponidis, who had been aware for some time that the plaintiff struggled with mental health issues, chose to address the plaintiff's problem behavior by arriving at his workstation with two campus police officers, who ultimately arrested the plaintiff and physically dragged him from the museum. The plaintiff testified at his deposition that he was paranoid, frightened, and so overcome by his heightened manic state that he could not control his choice of words, let alone the tone or volume with which he spoke them. After being arraigned on charges of trespassing and disorderly conduct,[3] the plaintiff was released by the police later that day. He was unable to go home, however, because the police had retained his house and car keys, and the plaintiff was afraid to attempt to retrieve them. He sought instead the safety of the museum and went there intending to wait outside for friends. The manner in which the plaintiff had been treated was, in his own words, "cruel handling of someone with a mental illness."

Presented with uncontested evidence of what followed, a reasonable jury might well conclude that the plaintiff's final outburst was, as characterized by the court, "abusive, threatening, and sexually derogatory." *Ante* at 668. Believing the plaintiff, however, they might just as likely conclude that the outburst,

---

[3]It is significant that the plaintiff was acquitted in the District Court of the charges against him, according to the Superior Court judge, "by reason of his mental state at the time of arrest."

part and parcel of his paranoid manic state, was intended only as a moral rebuke and, further, that more sensitive handling of the situation by Piponidis would háve averted the crisis altogether. The plaintiff testified at his deposition that it was "pretty obvious that [he] was severely mentally ill" and that "[s]evere mania is frightening to watch [but] even more frightening for the person going through it." The final scene in the lobby of the Museum of Natural History, which triggered the plaintiff's immediate termination, was not, as in the *Garrity* case, a course of behavior independently engaged in by the plaintiff in flagrant disregard of the museum's rules, but the culmination of a supervisor-employee interaction that, fueled by the plaintiff's illness, had escalated out of control. The court reasons that language in the *Garrity* decision compels the conclusion that no unlawful discrimination occurred because the same behavior would have resulted in the termination of a non-handicapped employee. See *Garrity* v. *United Airlines, Inc., supra* at 63. This reasoning ignores the critical point of the plaintiff's argument — a psychologically healthy employee would not have behaved, nor would he have been treated by his supervisors, in the same manner. There is nothing remarkable in my conclusion that, in these circumstances, the plaintiff is entitled to a jury's assessment whether his behavior rose to the level of "egregious misconduct." The court's suggestion that my view might differ "had [the plaintiff], for example, physically assaulted and harmed a museum patron," *ante* at note 24, is altogether unfounded. Cases must be decided on the record, and the record in this case contains no evidence that the plaintiff's symptoms, at any point in time, included physical violence.

I agree with the court that the ability to act calmly and peaceably, as opposed to erratically or threateningly, is an essential component of any job, especially one that involves interaction with the public, such as the plaintiff's position as staff assistant at Harvard's Peabody Museum. It follows that a handicapped employee whose disability compels him to behave in a unprofessional manner, or whose behavior poses a safety risk to others, has no chance of demonstrating that he is a "qualified handicapped employee" under G. L. c. 151B. See *Beal* v. *Selectmen of Hingham*, 419 Mass. 535, 543 (1995); *EEOC* v. *Yellow*

*Freight Sys., Inc.*, 253 F.3d 943, 949-950 (7th Cir. 2001); *Mazzarella* v. *United States Postal Serv.*, 849 F. Supp. 89, 94 (D. Mass. 1994). The plaintiff in this case, however, has presented an abundance of evidence that, for seven years up until the days immediately preceding his termination, his job performance at the museum was impeccable and met with only positive work evaluations. During that time, despite his illness, the plaintiff had (in the words of one supervisor) worked with "graciousness," "enthusiasm," and "efficiency." The evidence in the record thus demonstrates conclusively that the plaintiff was in fact capable of performing the essential functions of the job. This factor alone sets the plaintiff apart from plaintiffs in cases such as *Beal* v. *Selectmen of Hingham, supra* (police officer susceptible to stress-related blackouts), and *EEOC* v. *Amego, Inc.*, 110 F.3d 135, 144-145 (1st Cir. 1997) (therapist who abused prescription drugs had job responsibility to monitor and administer psychotropic medication to clients), where summary judgment was proper based on the plaintiff's inability to demonstrate that she was qualified for the job.

There is another important step in the discrimination analysis.[4] General Laws c. 151B defines a qualified handicapped person as one who can perform the essential functions of a job "with or without reasonable accommodation." In my view, before summary judgment is granted in its favor, Harvard must demonstrate that no "reasonable accommodation" would have enabled the plaintiff successfully to continue to perform his job. See *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 822 (1997); *Tate* v. *Department of Mental Health*, 419 Mass. 356, 360 (1995). This Harvard has not attempted to do.

I would reject Harvard's argument that the plaintiff's failure to request accommodation relieved it of any responsibility in this fundamental area of discrimination law. It is clear that the plaintiff was unable to recognize, or communicate, at the time his need for special treatment to accommodate his illness. We

---

[4]The court's conclusion that *Garrity* v. *United Airlines, Inc.*, 421 Mass. 55 (1995), bars the plaintiff from establishing his status as a "qualified handicapped person capable of performing the essential functions" of his job renders superfluous any discussion of "reasonable accommodation" on its part.

have never held that G. L. c. 151B requires an employer to initiate an interactive process to reach a reasonable accommodation for a handicapped employee. See *Sullivan* v. *Raytheon Co.*, 262 F.3d 41, 47-48 (1st Cir. 2000). The United States Court of Appeals for the First Circuit has recognized such a duty, however, and has stated that this duty is particularly important when an employee is suffering from a mental disability. See *Kvorjak* v. *State*, 259 F.3d 48, 52-53 (1st Cir. 2001); *Criado* v. *IBM Corp.*, 145 F.3d 437, 444 (1st Cir. 1998); *Jacques* v. *Clean-Up Group, Inc.*, 96 F.3d 506, 515 (1st Cir. 1996). See also *Bultemeyer* v. *Fort Wayne Community Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996), quoting *Beck* v. *University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) (stating "[i]n a case involving an employee with mental illness, the communication process becomes more difficult," and "[i]t is crucial that the employer [be] aware of the difficulties, and 'help the other party determine what specific accommodations are necessary' "); *Campbell* v. *Wal-Mart Stores, Inc.*, 272 F. Supp. 2d 1289, 1276, 1289-1290 (N.D. Okla. 2003) (recognizing that mental illness may prevent individual from comprehending need to request accommodation or ability to do so). I agree with the First Circuit and, based on the reasoning in the above cases, would impose an affirmative duty on the part of employers, in circumstances where it is obvious that a mentally handicapped employee is unable to initiate a request for reasonable accommodation and the employer knows, or should know, of the employee's need, to communicate to the employee a willingness to provide some type of special arrangements.[5] In my view, a jury could find that Harvard had a duty to offer the plaintiff a reasonable accommodation that was triggered at the point when Piponidis became aware, through her own observations and those of others, that the plaintiff was experiencing a severe manic episode and needed medical attention or, at least, an immediate leave of absence to seek medical attention on his own

---

[5]If the plaintiff had been experiencing an epileptic seizure, surely his supervisors could not lawfully have ignored his obvious need for medical attention and then terminate him because of inappropriate workplace behavior. The court responds to this hypothetical, *ante* at note 4, with the observation that the employee with epilepsy (a physical handicap) "did not commit misconduct at all." My point precisely.

accord. See *Russell* v. *Cooley Dickinson Hosp.*, 437 Mass. 443, 455-456 (2002); *Criado* v. *IBM Corp.*, *supra* at 443.

The record demonstrates that the day before the plaintiff was terminated, Piponidis sent him a letter (which the plaintiff did not receive) suggesting that he avail himself of Harvard's employee assistance program. This letter indicates Piponidis's recognition of the plaintiff's need for help and of her responsibility to assist the plaintiff in obtaining that help. It does not, however, necessarily absolve her of her failure to offer the same support the next day, or Harvard of its duty to provide reasonable accommodation in the days that followed when the plaintiff's union representative, and his attorney, attempted to negotiate his return to work following a leave of absence to seek medical treatment. Based on the body of evidence in the summary judgment record, I conclude that whether the plaintiff was a qualified handicapped employee whom Harvard should have accommodated with a temporary leave of absence for medical treatment is a triable issue. See *Labonte* v. *Hutchins & Wheeler*, *supra* at 820; *Bultemeyer* v. *Fort Wayne Community Schs.*, *supra* at 1285.

Mental illness makes life more difficult in almost every way imaginable. As a practical reality, if employees who suffer from bipolar disorder are to hold jobs at all, some measure of special treatment from employers may, from time to time, be necessary. The court's affirmation of Harvard's right to summarily terminate the plaintiff, on the basis of one manic episode and with no attempt to accommodate his illness, is regrettable. This conclusion undermines a fundamental purpose of G. L. c. 151B, to preserve the employment status of the handicapped, including the mentally ill. See *Dahill* v. *Police Dep't of Boston*, 434 Mass. 233, 240-241 (2001). We have held that, for purposes of the analogous Federal statute, § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, an individualized inquiry into whether a plaintiff is a qualified handicapped person is "essential if [the statute] is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of [employers] as avoiding exposing others to significant health and safety risks." *Cox* v. *New*

*England Tel. & Tel. Co.*, 414 Mass. 375, 383-384 (1993), quoting *School Bd. of Nassau County* v. *Arline*, 480 U.S. 273, 287 (1987). Given its remedial purpose, G. L. c. 151B likewise requires a reviewing court carefully to "measure whether the employer's decision 'reflect[s] a well-informed judgment grounded in a careful and open-minded weighing of the risks and alternatives.' " *Cargill* v. *Harvard Univ.*, 60 Mass. App. Ct. 585, 603 (2004), quoting *Hall* v. *United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988). No such weighing was conducted by Harvard in this case. The court's decision will make life even more difficult for those attempting to hold down a job while suffering with a mental illness, thereby undermining the compassion our society has expressed, through the Legislature's enactment of G. L. c. 151B, for someone in the plaintiff's circumstances.